THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. J.W. AUSTIN, Defendant-Appellant.

Second District   No. 2—89—0616

Opinion filed June 27, 1991.—Rehearing denied July 31, 1991.

NICKELS, J., specially concurring.

G. Joseph Weller, Paul J. Glaser, and Thomas A. Lilien, all of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, J.W. Austin, appeals his convictions of and sentences for two counts of attempted first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 9—1(a)(1)). Defendant raises two issues on appeal: whether he was denied the effective assistance of counsel where his attorney failed to seek jury instructions on attempted second degree murder; and whether the concurrent 10-year sentences are excessive.

At the jury trial, Lunetta "Lucy" Powell testified that she lived in the same apartment building as defendant. Lucy had known defendant for over a year prior to the incident. Defendant helped Lucy get a job at the cafeteria at Rockford College in November 1988. Defendant was employed there in food service and in maintenance. In December 1988, or January 1989, defendant loaned Lucy $50 so that she could pay her electric bill. In January, defendant told her to "forget about it" because Lucy had "bought him a half a gallon of booze and *** gave him five or ten dollars or something[,] and he says [sic] we'll call it even."

Lucy testified further that on February 2, 1989, she was under the influence of alcohol when she reported for work. At approximately 11 a.m., defendant noticed Lucy was intoxicated and told her that she should not have been working that day and that she ought to go home. Lucy then tried to call someone to get a ride home. Lucy was not certain, but she thought she took the bus home around noon. Lucy did not know what time it was when she got home, but she thought it was before 2 p.m. Delbert Hodges, Lucy's boyfriend, was already at her apartment, which did not have a telephone. The two began drinking beer when she got home. According to Lucy, they resumed drinking at 5 or 6 p.m. and continued to drink until defendant came over.

Lucy believed that it was between 8:30 and 9 that night that defendant arrived at the apartment. Lucy and Hodges were watching television. Lucy admitted defendant into the apartment. According to Lucy, defendant had been drinking, and his speech was slurred and he was staggering. Defendant sat in a chair by the end of the kitchen counter; Hodges was sitting on the couch, and Lucy sat on a table next to the couch. After defendant sat down, he took a gun from behind his back and put it between his legs. Lucy asked what defendant was doing with the gun, but defendant did not answer.

According to Lucy, defendant and she then discussed Lucy's "messing up at work." Hodges did not take part in the conversation. A short while later, Lucy's brother Marvin came over. He sat on the couch next to Hodges. When Marvin entered the apartment, defendant put the gun in the back of his pants. Marvin stayed for only a few minutes.

Lucy testified further that in the meantime defendant continued to discuss Lucy's work performance with her. Defendant was upset about it, and Lucy told him that she should not have come to work after drinking and that she would quit if that made defendant "look bad." Defendant then accused Lucy of having an affair in the store room with a co-worker. Lucy denied that and told defendant that she and the co-worker had gone down to the basement to get food from storage. Defendant then got ready to leave and mentioned the $50 which Lucy owed him. Lucy further testified:

> "He says, 'By the way, I want my $50 back.' And I said, 'I thought we were even.' And he says, 'No.' And I says, 'Oh, you change your mind now?' And he says, 'Yeah, you're god damn right.' And then he said, 'Well,' he says, 'Well, I want it tomorrow because I didn't pick up my check Thursday.' And I told him I would pay him some of it tomorrow, you know, and he

says he want [*sic*] all of it. And I say, 'Well, I don't really owe you the 50 anyway, I only owe you a partial of the 50.' And he says he wanted [it] tomorrow and he don't care if he gets it from me or Delbert. And Delbert—then Delbert says—says, 'Man, how much does she owe you?' And he says, '$50.' Delbert said, 'Don't worry, I'll go to the bank and get it for you tomorrow.' "

Defendant then walked towards the door, stopped and said, " 'Well, I'll tell you guys what, I'm gonna go to jail tonight because somebody's gonna die.' " Defendant pulled the gun out and fired it at Lucy. Lucy tried to move out of the way of the bullet, but it struck her in the back of her upper left thigh. Hodges was still sitting on the couch, and defendant pointed the gun at him and fired. Defendant fired again, yet Hodges was still sitting there, so Lucy told him to get out of the way, and she "hit the floor and *** crawled in the pantry." Lucy heard shots while she was in the pantry.

According to Lucy, she came out of the pantry and saw defendant and Hodges wrestling. Defendant saw Lucy and pointed the gun at her again. Lucy ducked back into the pantry and heard more shots. She felt like she had to do something, so she came back out. Lucy then saw that defendant was halfway out the door, which Hodges was trying to close. Lucy and Hodges pushed defendant out and closed the door. Lucy helped Hodges to the couch then went to the window and started yelling for help. Subsequently, Lucy noticed that there was a hole in one of her kitchen cabinets. Lucy denied that she or Hodges threatened or approached defendant before he started shooting.

Delbert Hodges testified that he had a rod in one of his legs which prevented him from running or bending his leg. Hodges' testimony was substantially similar to Lucy's regarding the events the night of the shooting. Marvin left the apartment after drinking one beer because Hodges sent him to the liquor store to get some more beer. According to Hodges, defendant stayed about an hour. Defendant said he was going to "kill somebody tonight." Defendant was standing by the counter when Hodges heard Lucy say defendant had a gun. Hodges heard a shot, and then defendant shot Hodges in the groin. Hodges was still sitting down. Hodges got up, not fully aware that he had been shot, and went towards defendant. Defendant kept shooting at Hodges. Hodges then pushed defendant out the door. After he was taken to the hospital, Hodges learned that he had been shot twice in the arm, and once in the wrist, groin area and chest. Hodges stated that he did not have a weapon, nor did he yell at or threaten defendant.

Hodges admitted that he had a "fifth [of wine] and a couple of beers" before noon on February 2, 1989. Hodges thought Lucy came home from work around 10 a.m. Hodges fell asleep for a while, then resumed drinking around 2 p.m. Hodges estimated that between himself and Lucy, they consumed two fifths of wine and a 12-pack of beer by 7 p.m. Hodges thought it was 6 p.m. when defendant came to the apartment and that defendant stayed for nearly two hours. Hodges believed defendant was drunk that night because he was "hollering at Lucy." According to Hodges, he was not drunk that night, but he "was feeling pretty good."

Reverend George Poole testified that he was the president of the resident counsel of the building in which defendant and Lucy lived. Shortly before 9 p.m., Reverend Poole was in his office on the main floor of the building when defendant came into the office. Defendant had blood on his jacket, so Poole asked if he had been hunting. Defendant told Poole:

> " 'No, Reverend, I want to surrender myself to you. I want to turn myself in. I just shot two people. *** They're up on the eighth floor.' "

Defendant then laid a gun on the desk and said that "he just didn't like nobody to misuse him." Poole was surprised because he had never known defendant to be violent. Poole immediately called the police. He then took the gun and locked it in a desk drawer. While they were waiting for the police to arrive, defendant gave Poole $310 to give to defendant's girlfriend. According to Poole, there was an odor of alcohol on defendant's breath.

Mark West of the Rockford police department testified that he went to Reverend Poole's office following the shooting. Poole gave him the gun. Defendant told West, " 'I did it. She owed me fifty bucks. Nobody does me wrong.' "

Arlene Powell, Lucy's mother, testified that late in the morning on the day of the shooting she received a call from Lucy. Arlene went to pick up Lucy at work, but she was not there. Arlene spoke with defendant, who told her that Lucy had been drinking, and she needed to go home. Defendant asked for Arlene's telephone number and said he would call her. Defendant also said he would be getting off work at 5 p.m.

Arlene further testified that sometime before 5 o'clock that afternoon, defendant called Arlene. He told her "that he had got off early and he was in Loves Park drinking good whiskey," and he asked if Arlene had found Lucy. Arlene said she had not, and defendant told her he would call back. Defendant also told Arlene that he was mad

and he had a bad day. Arlene did not know what time it was when defendant called back. According to Arlene, defendant sounded like he was drunk. He asked if Arlene had found Lucy. When she said no, defendant asked if she checked at Lucy's home and at Deborah's house. Defendant said "he was going to get his gun and go over to Deborah's house and kill up some people." Arlene told defendant she did not want to talk to him anymore that night and hung up.

Defendant testified that he was 56 years old, and he had worked at Rockford College for the past four years. Defendant had gotten the gun used in the shooting after he had been robbed and beaten. Defendant had a permit for the gun. At 9:30 a.m. the day of the shooting, one of the cafeteria workers came to defendant and told him that Lucy was drunk and that defendant had to get her out of the cafeteria. Defendant looked for Lucy for about five minutes, and he found her at the telephone. Lucy was crying, and she told defendant that she called her mother. Defendant told Lucy that she had to go home. According to defendant, Lucy had reported for work drunk three times before that, and no one but defendant could get her to leave.

Defendant further testified that at 1 p.m., Lucy's mother came to the cafeteria. Defendant talked with her for a while and asked for her phone number because he "wanted to call her and tell her what the boss said. He said he didn't want [Lucy] out there drunk no more. If she couldn't come to work straight, he couldn't use her."

Defendant then testified that he left work early to help one of the cooks deliver instruments and amplifiers in Loves Park. At about 3 o'clock in the afternoon, defendant drank half of a half-pint of brandy. Defendant returned home around 5 o'clock. Defendant called Arlene, but she did not know where Lucy was. At approximately 8 p.m., defendant called Arlene again and asked her to tell Lucy that her supervisor said that Lucy was fired. Defendant denied that he said anything regarding people dying. Defendant intended to go to Lucy's apartment first, then to a neighbor's apartment to return $10 defendant borrowed, and then to his mother's house. Defendant had his gun with him because his mother lived in a bad neighborhood where defendant had been robbed.

Defendant further testified that he arrived at Lucy's apartment sometime after 8 p.m. Defendant advised Lucy that their supervisor wanted defendant to tell Lucy not to come to work anymore. Defendant also asked Lucy to give him $50 the following day after she got paid because she had promised to repay him. Defendant explained that he did not ask for the money before that because Lucy's "first

paycheck was small \*\*\*. \*\*\* [T]he next one she got 200 and some dollars and she went off and bought it all up in drugs \*\*\*." Hodges then asked Lucy if she owed defendant $50, to which she responded, "[n]ot really." Defendant then testified:

> "[W]hen she told him that the reason she didn't think she owed me $50 [was] that I had been trying to get her to go to bed with me. And that time, Mr. Hodges jumped up. He said, 'what?' And he jumped—he lunged up and come after me and he had got about halfway between the couch and me. And knowed [*sic*] that he was coming to do something to me because he was—you know, he was running.
>
> So \*\*\* when I started shooting at him to turn him around, I tried to hit him in the arm, I couldn't tell I had hit him because he was still coming.
> \*\*\*
> \*\*\* I know they were going to do something. \*\*\* [H]e jumped up and come after me like that with that tone of voice and everything. And I had been jumped on before, and I don't like taking chances, I don't like to be hurt."

According to the defendant, when Hodges grabbed him, defendant began backing up towards the door. Hodges "ran in on" defendant. They scuffled for a minute, and then defendant shoved Hodges and got out the door. According to defendant, Lucy intended to join in the scuffle, and that is when defendant shot her. Defendant stated that he did not intend to shoot Lucy, but she got hit because defendant "was just shooting." Defendant denied that he intended to kill Lucy or Hodges, and he "had nothing against the people."

Defendant further testified that after leaving the apartment, he went down to Reverend Poole's office. Defendant gave Poole the gun and told him defendant had shot a person. Defendant also told Poole to call the police. Although defendant did not see either Hodges or Lucy with a weapon, defendant believed "they had something." Defendant knew he shot at Hodges three times.

Larry Little, defendant's supervisor, testified that defendant "was an exceptional employee." On the morning of the shooting, Lucy arrived at work "somewhat intoxicated." Lucy was quite loud, and Little tried to get her to leave without creating a disturbance. Little had defendant try to talk Lucy into leaving. According to Little, Lucy left the cafeteria around 10 a.m. Defendant worked until 2:30 or 3 p.m. Defendant's reputation with the students around the campus was "excellent."

Charles Cornele and Linda Cornele also testified that defendant's reputation in the community was excellent and that defendant was "very upstanding."

Shirley Nabors testified that defendant was "very gentle and kind to everyone." Nabors was at defendant's apartment the afternoon before the shooting. Defendant came home around 5 p.m. and was not intoxicated. Defendant did not appear in a bad mood. Neither Nabors nor defendant had anything to drink that evening. Shortly before 9 p.m., defendant said he was going to repay the neighbor, and he would come right back before going to visit his mother. According to Nabors, defendant and Lucy were "real good friends." Occasionally, defendant invited Lucy to dinner at Nabors' apartment.

Detective Hanson testified in rebuttal regarding the statement defendant gave after the shooting. According to Hanson, defendant said that when Hodges came towards him, defendant pulled his gun out and shot Hodges three times. Defendant thought he shot Hodges once in the chest, once in the stomach and once in the side. After Hodges was shot, Lucy started running towards the pantry, and defendant shot her once before she made it to the pantry. Defendant " 'shot her because she was lying about [defendant] going to bed with her.' "

The jury returned verdicts of guilty of attempted murder of both Delbert Hodges and Lucy Powell. Defendant filed a motion for a new trial alleging, among other things, that the State did not prove that defendant intended to kill the victims. The motion was denied, and the cause proceeded to sentencing.

Reverend Poole testified that defendant helped some of the handicapped residents of the apartment complex and that he was not aggressive or argumentative. In addition, Poole stated that defendant was a deacon in his church. Finally, Poole noted that the residents of defendant's building held a meeting to express support for defendant because he had contributed to the welfare of the residents of the complex.

Charles Cornele testified that defendant was law abiding and that he was always trying to get other people out of trouble. He helped young people get jobs at the cafeteria, which "straightened them out." Shirley Nabors also testified that defendant helped others. Defendant also called several other witnesses who also testified to defendant's law-abiding nature and his record of hard work. Defendant expressed remorse for the shooting and stated that he never intended to kill anyone or do them any harm.

The court recognized that defendant had been a good person but that "something went wrong that night," that "something snapped and [defendant] helped it snap by drinking and carrying a gun." The court noted that the minimum sentence would be appropriate considering defendant's lack of criminal history; however, since both victims suffered permanent injury and there were two convictions, the minimum sentence should not be imposed. The court, therefore, imposed concurrent sentences of 10 years' imprisonment.

On appeal, defendant first contends that he was denied the effective assistance of counsel because his attorney failed to seek jury instructions on attempted second degree murder. In order to resolve this issue, we must first determine whether such an offense as attempted second degree murder exists. This necessitates a comparison between the voluntary manslaughter statute which was repealed in 1987 (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) and the second degree murder statute which was enacted in 1987 (Ill. Rev. Stat. 1987, ch. 38, par. 9—2).

The voluntary manslaughter statute provided in pertinent part as follows:

"A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing *** but his belief is unreasonable." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).)

The second degree murder statute provides in pertinent part as follows:

"A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code

[(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another or knows that such acts will cause death to that individual or another or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2))] and either of the following mitigating factors are present:
***

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing *** but his belief is unreasonable." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(2).

■ By way of historical background, our supreme court held that there was no such offense as attempted voluntary manslaughter when the defendant is acting under an unreasonable belief that self-defense was necessary. (*People v. Reagan* (1983), 99 Ill. 2d 238, 240.) However, even the *Reagan* court acknowledged that there could be such an offense but for the fact that our attempt statute requires specific intent and voluntary manslaughter is not a specific intent crime. (Ill. Rev. Stat. 1979, ch. 38, par. 8—4(a); *Reagan*, 99 Ill. 2d at 241.) The real dilemma, as outlined in *Reagan*, is that the specific intent required was not just the intent to kill but to kill without legal justification. (99 Ill. 2d at 240.) Since one cannot intend an unreasonable result (*People v. Viser* (1975), 62 Ill. 2d 568, 581), no such offense as attempted voluntary manslaughter based upon an unreasonable belief is possible.

The defendant relies on *People v. Moore* (1990), 204 Ill. App. 3d 694, for the proposition that Illinois law now recognizes the offense of attempted second degree murder. In *Moore*, the defendant, who was convicted of attempted second degree murder, argued on appeal that there was no such offense because one cannot specifically intend a sudden and intense passion. The Appellate Court, Third District, recognized that prior to the change in the murder statute, effective July 1, 1987, there had been no such offense as attempted voluntary manslaughter, which was the killing of a person without legal justification while the defendant was acting under a sudden and intense passion resulting from serious provocation. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—2.) The *Moore* court explained, however, that under the present law, to find a defendant guilty of second degree murder, the trier of fact must *first* find that the State has proved all the elements of first degree murder and then must consider whether the defendant acted under a sudden and intense passion resulting from serious provocation. (*Moore*, 204 Ill. App. 3d at 698; Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1).) The court reasoned that since the intent element is unrelated to the mitigating factor of provocation, a defendant could be convicted of attempted second degree murder. *Moore*, 204 Ill. App. 3d at 698.

The special concurrence in this case argues that the flaw in the argument advanced in *Moore* is that the voluntary manslaughter statute also required the State to first prove all of the elements of mur-

der. (*People v. Shumpert* (1989), 126 Ill. 2d 344, 351.) The special concurrence takes the position that the only substantive change the legislature made in repealing the voluntary manslaughter statute and enacting the second degree murder statute was to realign the burden of proof as to mitigation. This ignores the fact that the statute was in fact completely rewritten as well as renamed.

■ What the *Moore* court did was to recognize that under the new statute the intent element was dealt with separately from the question of provocation thus eliminating the problem of the "unintended result." While *Moore* dealt with the "sudden and intense passion" form of mitigation and expressly stated that the question of unreasonable self-defense was not being addressed, we believe that the rationale for its conclusion that such an offense exists applies in the case at bar as well. To illustrate, in order for the defendant in this case to be found guilty of attempted second degree murder, the jury must first find that defendant intended to kill without lawful justification; in other words, the self-defense argument raised by the defendant must be rejected in order for the attempt to kill to be without lawful justification. Then the question of mitigation is addressed. Although the jury rejected the self-defense argument, it could still determine that defendant actually thought he needed to act in self-defense but that he was mistaken. Thus, although both voluntary manslaughter and second degree murder require that the elements of murder be proved first, the key is, as the *Moore* court observed, that the second degree murder statute requires a two-step process, rather than considering the defendant's intent along with the applicable statutory mitigation, as was the case with the voluntary manslaughter statute. Therefore, we conclude that the offense of attempted second degree murder based upon an unreasonable belief in the need for self-defense does exist.

■ While we would follow *Moore* and find that defendant could be convicted of attempted second degree murder, we agree with the State that defendant was not prejudiced by counsel's failure to seek an instruction on this offense. To prevail on a claim asserting the ineffective assistance of counsel, a defendant must establish that counsel's conduct was professionally deficient and, but for the deficiency, there is a reasonable probability that the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 688, 695-96, 80 L. Ed. 2d 674, 698-99, 104 S. Ct. 2052, 2068-69; *People v. Albanese* (1984), 104 Ill. 2d 504, 526.) Competency of counsel is presumed (*People v. Stewart* (1984), 101 Ill. 2d 470, 492), and alleged incompetence arising from a matter of trial tactics or strategy will not,

by itself, support a claim of the ineffective assistance of counsel (*People v. Hillenbrand* (1988), 121 Ill. 2d 537, 548).

■■■ For the jury to have convicted defendant of attempted second degree murder, it would have been required to find that defendant's actions were motivated by either a sudden and intense passion resulting from serious provocation or an actual, but unreasonable, belief that the circumstances required the use of deadly force as a means of self-defense. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—2(a)(1), (a)(2).) The evidence showed that Hodges could not jump or run because he had a rod in his leg, Lucy was shot in the back of the leg, and the angle of the bullet lodged in the kitchen cabinet established that the gun was aimed downwards when that shot was fired. Based on this evidence and defendant's statements to Reverend Poole and Officer West, that nobody misuses defendant or "does him wrong," the jury could not have found that defendant mistakenly believed that he had to use deadly force because Hodges and Lucy were charging at him. Had the jury believed defendant's testimony in that regard, it probably would have convicted him of aggravated battery, not attempted first degree murder. In addition, misuse of a person or lying by the victim is not conduct sufficient to excite an intense passion in a reasonable person. (See *People v. Chevalier* (1989), 131 Ill. 2d 66, 71-72.) We therefore conclude that, even had the attempted second degree murder instruction been given, there is not a reasonable probability that defendant would have been convicted of attempted second degree murder rather than attempted first degree murder. Since defendant was not prejudiced by the alleged error, his ineffective assistance of counsel claim must fail (see *People v. Stewart* (1990), 141 Ill. 2d 107, 118-19), and his conviction will not be reversed.

Defendant next contends that the trial court abused its discretion when it sentenced defendant to concurrent terms of 10 years and when it considered what might have happened if the victims had died.

■■ Supreme Court Rule 615(b)(4) grants the appellate court the discretionary power to reduce an excessive sentence. (134 Ill. 2d R. 615(b)(4).) However, we will not use this power unless the trial court abused its discretion in sentencing defendant. (*People v. Andrews* (1989), 132 Ill. 2d 451, 464.) Where a sentence is within the statutory limits, we may not reduce it merely because we might have balanced the sentencing factors differently and imposed a different sentence. *People v. Streit* (1991), 142 Ill. 2d 13, 19.

Attempted first degree murder is a Class X felony (Ill. Rev. Stat. 1989, ch. 38, par. 8—4(c)(1)), which carries a mandatory term of imprisonment of between 6 and 30 years (Ill. Rev. Stat. 1989, ch. 38,

pars. 1005—5—3(c)(2)(B), 1005—8—1(a)(3)). The statutory factors in mitigation which applied here are that defendant had no history of prior criminal activity, and his character indicates that he is unlikely to commit another crime. (See Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.1(a)(7), (a)(9).) The aggravating factor found by the trial court was that defendant's conduct caused serious harm. See Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(a)(1).

■ Although the court discussed what might have happened had the victims died and that defendant might have been eligible for consecutive sentences since two people were shot, from our reading of the record we conclude that these comments did not reflect the trial court's basis for the sentences. The trial court considered defendant's contributions to the community and his lack of criminal history. The trial court decided to sentence defendant to a term only four years longer than the minimum because defendant shot two people, one of them three times, and caused permanent injury to both of them. As noted above, this is a proper factor to consider in aggravation. In light of the circumstances, we do not believe that the sentence was the result of an abuse of discretion.

The judgment of the circuit court is affirmed.

Affirmed.

BOWMAN, J., concurs.

JUSTICE NICKELS, specially concurring:

I would affirm the trial court; however, I do not agree with the underlying analysis of the majority as to defendant's alleged ineffective assistance of counsel. The majority relies on the decision of the Appellate Court for the Third District in *People v. Moore* (1990), 204 Ill. App. 3d 694, which recognized the offense of attempted second degree murder, and proceeds to review defendant's attorney's failure to request such a jury instruction to determine if that omission affected the outcome of the proceeding. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 525-26.) However, such review is unnecessary because the Illinois Supreme Court has expressly rejected the existence of an offense of attempt based on an underlying offense of voluntary manslaughter, which is both the predecessor of and, for these purposes, indistinguishable from second degree murder. *People v. Reagan* (1983), 99 Ill. 2d 238, 240-41.

In *Reagan*, the supreme court rejected the surface appeal of the argument accepted in *Moore* and by the majority here, that conduct

susceptible to charges of second degree murder if the victim dies can form the basis of attempted second degree murder if the victim survives. (*Reagan*, 99 Ill. 2d at 241.) Just as with voluntary manslaughter, to prove attempted second degree murder, the State must still prove that the defendant had the specific intent to "kill[ ] an individual without lawful justification." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2; Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 9—1, 9—2; *Reagan*, 99 Ill. 2d at 240-41.) However, a defendant guilty of second degree murder either believes himself lawfully justified and cannot, therefore, intend to kill without lawful justification or is acting under strong provocation engendering a sudden and intense passion, which, too, cannot be intended. (See Ill. Rev. Stat. 1987, ch. 38, pars. 9—2(a)(1), (a)(2).) Thus, the killing without lawful justification that results is unintended, and "[t]here is no such criminal offense as an attempt to achieve an unintended result." *People v. Viser* (1975), 62 Ill. 2d 568, 581, cited by *Reagan*, 99 Ill. 2d at 240.

*Moore* is the only authority that has recognized the offense of attempted second degree murder; however, it is in direct conflict with *Reagan*. (Compare *Reagan*, 99 Ill. 2d at 240-41, with *Moore*, 204 Ill. App. 3d at 698.) The legislature in enacting the 1987 second degree murder statute renamed voluntary manslaughter and, more importantly, substantively realigned the burden of proof so that a defendant must now prove either provocation or unreasonable belief by a preponderance of the evidence, rather than the State disprove either beyond a reasonable doubt. (*People v. Shumpert* (1989), 126 Ill. 2d 344, 351-52.) In so doing, the second degree murder statute defines the offense in terms of first degree murder and then considers the mitigating factors of unreasonable belief or provocation. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a).) Based solely on that change, *Moore* found that the second degree murder statute transformed voluntary manslaughter into a specific intent crime because the State must first prove a defendant guilty of the specific intent crime of first degree murder. (*Moore*, 204 Ill. App. 3d at 698.) However, voluntary manslaughter also required the State to first prove each of the elements of murder. (*Shumpert*, 126 Ill. 2d at 351.) Thus, the legislature neither changed the essential nonspecific nature of the offense of second degree murder nor diminished the applicability of *Reagan* and *Viser*.

The majority's analysis of the effect of defendant's attorney's failure to request a jury instruction on "attempted second degree murder" is unnecessary, and I do not partake in it. I concur in the balance of the majority opinion regarding the other issue raised concerning defendant's sentence.