THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CORNELL CUNNINGHAM, Defendant-Appellant.

Third District   No. 3—92—0262

Opinion filed December 9, 1993.

Dan W. Evers, of State Appellate Defender's Office, of Mount Vernon, for appellant.

James Glasgow, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

The defendant, Cornell Cunningham, was convicted of attempted first degree murder and aggravated battery with a firearm and was sentenced to concurrent extended terms of 40 years' imprisonment. On appeal, defendant contends that: (1) the jury was improperly instructed; (2) defendant's trial counsel was ineffective; (3) defendant was improperly convicted of two crimes based on a single act; and (4) defendant was improperly sentenced to an extended term. We affirm in part and vacate in part.

Tim Milavec testified that on October 19, 1991, he went to the defendant's home to see defendant's brother, Albert. The defendant asked Milavec to take him to the home of Albert's girlfriend, Julie Rideout, and Milavec agreed. Milavec denied having a sawed-off shotgun in his car. During the trip, the defendant stated, "[I]f they don't disrespect me, I am not going to disrespect them." Milavec knew that the defendant was a gang member. After defendant entered a house, Milavec heard some arguing and then two shots. Defendant came out of the house carrying a shotgun and walked across the street to talk to someone. A man came walking down the street and the defendant said something to him. The defendant fired the shotgun twice and Milavec saw the man lying on the ground. The defendant then got in Mi-

lavec's car and told Milavec that "the guy was going to shoot [me]." Milavec drove the defendant home.

Faye Rideout testified that she lived in the downstairs apartment at 126 Iowa Avenue in Joliet. On October 19, 1991, around 12 or 12:30 p.m., the defendant came to Rideout's residence looking for his brother, Albert. The defendant appeared to be intoxicated. The defendant talked to Albert in Erica Rideout's bedroom. When the defendant came out of the bedroom he was holding a sawed-off pump shotgun. Faye Rideout asked the defendant why he had come in her residence with a gun and was "disrespecting [her] house." The defendant stated that the gun was "on safety" and he dropped the gun on a mattress. The defendant then picked the shotgun up, said, "If you want disrespect, I will give you disrespect," and shot twice into the walls. The defendant left the Rideout residence, and Faye Rideout later heard two shots outside. Faye went outside and saw the victim, William Foster, lying on the ground.

Lisa Sherdon and Bill Dixon testified that they lived in the apartment above Faye Rideout. Dixon heard two shots from the downstairs apartment and called the police. Sherdon went downstairs and stood on the porch. Dixon and Sherdon saw the defendant walking across the street, and they saw a man, later identified as William Foster, walking down the sidewalk toward the defendant. Dixon and Sherdon heard the defendant say "GDK" and then shoot at Foster. Dixon heard Foster say, "I ain't nobody. I ain't nobody." Sherdon heard Foster say, "I am not nothing. I am not nothing." Foster started to move away from the defendant, and the defendant shot at him again. Foster fell to the ground, and the defendant ran to the car and it drove away. Dixon grabbed a towel from his kitchen and placed it on Foster's face. Sherdon also went to try to help Foster. He was shot in the face, with extensive damage to his eyes, and was bleeding. Neither Dixon nor Sherdon saw William Foster with any weapon or make any aggressive moves towards the defendant.

Joliet city police officer Thomas Todd testified that on October 21, 1991, he questioned the defendant about the shooting. The defendant told Todd that on the morning of the shooting he had consumed approximately three-fourths of a pint of rum. The defendant was at his mother's residence when Tim Milavec came over and asked about the defendant's brother, Albert. The defendant agreed to go with Milavec to 126 Iowa Street.

Inside Milavec's car the defendant noticed a sawed-off shotgun. The defendant took the shotgun with him into Julie Rideout's residence. The defendant told Todd that he was a gang member, and he

knew that he was going into rival gang territory, so he felt he needed a weapon for his protection. At the residence, the defendant asked Albert to come outside and speak with Milavec. According to Todd, defendant stated that Faye Rideout told the defendant that she was going to call her brother, who was a member of a rival gang, and tell him that the defendant was at her house with a shotgun. The defendant became angry at this statement and he fired a shot into the west wall of the apartment. Defendant pumped another round into the shotgun and fired into the south wall, and then left the apartment.

Todd further testified that the defendant told him that as he was approaching Milavec's car, he saw Foster walking westbound on Second Avenue. Foster appeared to have a shirt wrapped around his left hand and the defendant believed that Faye Rideout had contacted her brother and that her brother may have sent this individual to the area. Defendant told Todd that he thought Foster might have a weapon underneath the shirt. The defendant ran across the street, yelled "GDK," and fired at Foster. The defendant stated that he chambered another shell and fired the shotgun a second time, striking Foster in the face and causing him to fall to the ground. According to Todd, the defendant told him that after the first shot, Foster threw up his arms to cover his head and face and began moving backwards. After the shooting, the defendant went to Chicago, where he remained until he was arrested.

Joliet city police officer Robert Kerwin testified as an expert witness on street gangs. According to Kerwin, the tattoos on defendant's arms were associated with two particular gangs. The term "GDK" is a gang slogan which is sometimes shouted prior to the shooting of a rival gang member.

William Foster testified that on October 19, 1991, he worked as a bus driver for the Pace Motor Hotel. Foster was dressed in black dress slacks, a white shirt, a black tie, a black cardigan sweater, and a red jacket. Foster went to work with a bag of microwave popcorn and a deck of cards in a paper bag. Later, Foster drove to the east side of Joliet to have his car worked on. Foster learned that it would take approximately an hour and a half to have his car fixed, so he decided to wait at his sister's house, which was located a few blocks away.

Foster walked down Second Avenue and crossed a bridge. He saw a person, later identified as the defendant, talking to another man. The defendant turned and walked towards Foster and then fired a sawed-off shotgun at him. Foster began to move away from the defendant, who continued to walk towards him. Foster heard the

defendant pump another shell into the chamber. Foster was carrying his brown lunch bag in his right hand, and the defendant twice asked him, "What are you going in that bag for?" Each time Foster replied, "I am not." The defendant held the shotgun up and yelled "GD." Foster put his hands up to try to shield his face and the defendant fired the shotgun. Foster was struck in the face and fell to the ground.

Foster testified that he now has an artificial right eye. His left eye was also badly injured and he has blurry vision. The last thing he saw was the shotgun pointed at him. Foster denied being a member of a gang. Foster believed the defendant was trying to kill him.

The defendant testified that the evening of October 18 and early morning of October 19 he had been drinking. He was at his mother's residence during the morning of October 19 when Tim Milavec came by. The defendant was "pretty much high." Milavec asked about defendant's brother Albert. The defendant agreed to go with Milavec to look for Albert. They travelled in Milavec's car to Julie Rideout's apartment. When they arrived at the apartment, the defendant grabbed a .20-gauge pump shotgun that had been in the car. After speaking to his brother at Rideout's apartment, the defendant and Faye Rideout began to argue. Rideout asked the defendant why he disrespected her by bringing a gun into the house. The defendant got upset and said, "I will show you disrespect." The defendant shot into the ceiling twice and left.

After leaving the apartment, the defendant spoke with a man on the street and asked whether he had anything to do with the "GDs" who defendant said had attacked him. The man said he had nothing to do with the attack. The defendant then saw Foster walking across the bridge. According to defendant, Foster may have been carrying a jacket over his right arm. Defendant asked Foster whether he had anything to do with the "GDs" who had attacked the defendant, but he did not answer. The defendant fired the first shot, and Milavec called to him to get in the car. The defendant fired a second shot and then got in the car. The defendant never saw Foster fall and he did not know Foster had been shot until after he was arrested. Defendant stated that he did not aim at Foster and he was not trying to kill him. When asked what he thought Foster had in his hands, he replied, "The only thing I recall is he had [a] jacket."

The defendant identified two photographs depicting a mark on his face that he received in an incident on Washington Street a few blocks away from where the shooting occurred. In that incident, he was walking down the street when he heard "GD." Defendant turned

around and he was attacked, receiving a cut on the face. This incident was what he was asking Foster about before the shooting. The defendant denied belonging to a gang, although he admitted he had been a gang member when he was 10 or 11 years old.

On cross-examination, defendant denied telling Milavec on the drive over to Rideout's apartment that there would be no trouble "unless they disrespected" the defendant. Defendant stated four times that when he saw Foster walking down the street, he was not afraid of him. Defendant admitted that he could have left the area and that Foster did not threaten the defendant. Moreover, when asked whether he ever at any time thought that Foster was a threat, defendant replied, "Not really. That is why I didn't shoot directly at William Foster." Later, when defendant was again asked whether he was afraid that Foster was about to use force against him, defendant answered, "No, I wasn't." Defendant also denied telling Tim Milavec that Foster was going for a gun and that was why defendant shot him.

The jury returned a verdict of guilty of attempted first degree murder and aggravated battery with a firearm. The court found that the offenses were accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and the defendant was sentenced to two concurrent extended terms of 40 years imprisonment.

Defendant first contends that he was denied a fair trial because the jury was instructed with a modified version of Illinois Pattern Jury Instruction No. 26.01Q (Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (2d ed. Supp. 1989)) (hereinafter IPI Criminal 2d No. 26.01Q (Supp. 1989)). Specifically, defendant objects to the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989) which, in its modified form, stated:

"If you find the State has proved the defendant guilty of either or both attempt first degree murder or aggravated battery with a firearm you should select the verdict form or forms that reflect the verdict and sign it as I have stated. Under these circumstances, do not sign the verdict form finding the defendant guilty of reckless conduct."

This instruction was given at the State's request because the jury was also instructed, at the defendant's request, on the lesser included offense of reckless conduct. Defendant maintains that while IPI Criminal 2d No. 26.01Q (Supp. 1989) may be appropriate where the jury is to be instructed on a lesser included offense, it should not be given when the greater and lesser offenses include mental states which are mutually exclusive. In this case the defendant was charged with at-

tempted first degree murder, which requires proof that the defendant acted with the intent to kill (Ill. Rev. Stat. 1991, ch. 38, pars. 8—4, 9—1(a)(1)), and aggravated battery with a firearm, which requires proof that defendant acted knowingly (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2). On the other hand, a person commits reckless conduct when he endangers another's safety or causes bodily harm by performing an act recklessly. (Ill. Rev. Stat. 1991, ch. 38, par. 12—5.) A determination that a defendant acted intentionally or knowingly, coupled with a finding that he also acted recklessly, would be legally inconsistent. *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335.

The defendant acknowledges that the modified IPI Criminal 2d No. 26.01Q (Supp. 1989) given in this case was an attempt by the State and the trial court to prevent the jury from returning inconsistent verdicts. Defendant contends, however, that the instruction "channeled" the jury toward verdicts of attempted murder and aggravated battery with a firearm and away from a verdict of reckless conduct. Defendant argues that the instruction required the jury to return guilty verdicts on the more serious charges even if it found that defendant had also acted recklessly, because the jury was not instructed that the mental states were mutually exclusive. Defendant maintains that the jury should have been given an instruction similar to the current version of IPI Criminal No. 26.01Q (Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (3d ed. 1992)) (hereinafter IPI Criminal 3d No. 26.01Q), which states in part:

"Under the law, the defendant cannot be guilty of [greater offense] and [lesser offense]. Accordingly, if you find the defendant guilty of [greater offense], that verdict would mean that the defendant is not guilty of [lesser offense]. Likewise, if you find the defendant guilty of [lesser offense], that verdict would mean that the defendant is not guilty of [greater offense]."

Defendant also contends that his trial counsel was ineffective because he failed to tender IPI Criminal 3d No. 26.01Q. Defendant acknowledges, however, that the third edition of the Illinois Pattern Jury Instructions had not been published at the time of defendant's trial.

In *People v. Summers* (1990), 202 Ill. App. 3d 1, 559 N.E.2d 1133, the court held that in cases where "the jury has before it not only greater and lesser offenses, but a lesser offense having the less culpable mental state of recklessness, the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989) should *not* be given." (Emphasis in original.) (*Summers*, 202 Ill. App. 3d at 14, 559 N.E.2d at 1141; accord

*People v. Tucker* (1993), 245 Ill. App. 3d 722, 614 N.E.2d 1265.) The reason that IPI Criminal 2d No. 26.01Q (Supp. 1989) should not be given in such cases is because in its *unmodified* form, it instructs the jury that if it finds the defendant guilty of *both* the greater and lesser offenses, it should sign the verdict form for the greater offense and not for the lesser offense. The problem, of course, is that if the greater and lesser offenses require proof of mental states which are mutually exclusive, then a finding by the jury that the defendant was guilty of both offenses would be legally inconsistent and invalid. (See *Hoffer*, 106 Ill. 2d 186, 478 N.E.2d 335.) The modified IPI Criminal 2d No. 26.01Q (Supp. 1989) given in this case, however, did not misinform the jury in this manner. Rather, the instruction merely told the jury that if it should find the defendant guilty of either or both of the greater offenses, then it should not also find the defendant guilty of the lesser offense. This was a correct statement of the law, albeit not as complete as that embodied in IPI Criminal 3d No. 26.01Q. We find, however, that any error in failing to give a more complete instruction was harmless.

"In determining the effect of faulty jury instructions on the validity of a defendant's conviction, the instructions should not be judged in artificial isolation but must instead be considered in light of the record as a whole, including the evidence and arguments presented to the jury." (*People v. Towns* (1993), 157 Ill. 2d 90, 109.) The jury in this case received specific instructions explaining the legal elements of attempted murder, aggravated battery with a firearm, and reckless conduct. In addition, in closing arguments, the assistant State's Attorney correctly and thoroughly conveyed the concept of inconsistent verdicts to the jury.

"MR. BALDACCI [assistant State's Attorney]: Ladies and gentlemen of the jury, *you cannot find the defendant guilty of attempt first degree murder and/or aggravated battery with a firearm and still find him guilty of reckless conduct. You cannot find him guilty of all three.*

*If you find his actions were reckless and not intentional, that precludes the finding that they were intentional.* \* \* \*

\* \* \*

So you will be instructed that if you find that the State has proven the case beyond a reasonable doubt, that the defendant committed attempt first degree murder and/or aggravated battery with a firearm, you should find him guilty of those two offenses. You should not sign any other verdict forms.

The instructions will read the defendant is charged with the offense of attempt first degree murder. Under the law, a person charged with attempt first degree murder may be found not guilty or guilty of attempt first degree murder or guilty of reckless conduct, 'or guilty,' not 'and guilty,' ladies and gentlemen.

The defendant is charged with aggravated battery with a firearm. Under the law, a person charged with aggravated battery with a firearm may be found not guilty or guilty of aggravated battery with a firearm or guilty of reckless conduct, 'or guilty of reckless conduct,' not 'and guilty of reckless conduct.'

\* \* \*

Ladies and gentlemen, what this means is you can find this defendant not guilty of anything, in which case, you would sign the two verdict forms that read, 'We, the jury, find the defendant, Cornell Cunningham, not guilty of attempt first degree murder.' And, 'We, the jury, find the defendant, Cornell Cunningham, not guilty of the offense of aggravated battery with a firearm,' or you can find this defendant guilty of either attempt murder or aggravated battery with a firearm or both. In which case, you would sign the two guilty verdicts, 'We, the jury, find the defendant, Cornell Cunningham, guilty of the offense of attempt first degree murder,' or, 'We, the jury, find the defendant guilty of the offense of aggravated battery with a firearm.'

Or you can make the third finding. *That third finding you could make is that the defendant did these acts recklessly as opposed to intentionally or knowingly. And if you find that, then you would sign just the one verdict form, 'We, the jury, find the defendant guilty of reckless conduct.'* Just so that is clear, that you do not sign the reckless conduct instruction if you find him guilty of either aggravated battery with a firearm or attempt first degree murder." (Emphasis added.)

■ We hold that no error was committed in giving the modified IPI Criminal 2d No. 26.01Q (Supp. 1989) and, under the circumstances, we further find that defendant was not prejudiced by the failure to give an instruction comparable to IPI Criminal 3d No. 26.01Q. Given this lack of prejudice, we also reject defendant's claim of ineffective assistance of counsel based on his attorney's failure to tender such an instruction. See *Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069 (claim of ineffectiveness can be disposed of by showing that defendant suffered no prejudice from the claimed error).

Defendant next contends that his trial counsel was ineffective because he did not tender a jury instruction on the offense of attempted second degree murder. Defendant argues that there was "substantial" evidence presented at trial that he shot Foster because he mistakenly believed that Foster was a member of a rival gang who posed a threat to the defendant. Therefore, according to the defendant, the jury could have found that he believed that he was acting in self-defense, but that belief was unreasonable. Defendant maintains that, in failing to tender an attempted second degree murder instruction based on this theory, his defense counsel was ineffective. We disagree.

To sustain a conviction for second degree murder, the State must first prove the elements of first degree murder beyond a reasonable doubt. Thereafter, the defendant has the burden of proving by a preponderance of the evidence either: (1) that he was acting under a sudden and intense passion resulting from serious provocation; or (2) that he believed the circumstances to be such that they would justify the use of deadly force but this belief was unreasonable (*i.e.*, "imperfect" self-defense). (Ill. Rev. Stat. 1991, ch. 38, pars. 9—2(a)(1), (a)(2); see *People v. Drakeford* (1990), 139 Ill. 2d 206, 564 N.E.2d 792.) We note that there is disagreement among the districts of the appellate court concerning the existence of the offense of *attempted* second degree murder. (Compare *People v. Turcios* (2d Dist. 1992), 228 Ill. App. 3d 583, 593 N.E.2d 907 (offense of attempted second degree murder based on imperfect self-defense exists); *People v. Austin* (2d Dist. 1991), 215 Ill. App. 3d 323, 574 N.E.2d 1297 (same), with *People v. Cruz* (1st Dist. 1993), 248 Ill. App. 3d 473, 618 N.E.2d 591 (offense of attempted second degree murder based on imperfect self-defense does not exist), *appeal allowed* (1993), 152 Ill. 2d 566; *People v. Lopez* (1st Dist. 1993), 245 Ill. App. 3d 41, 614 N.E.2d 329 (attempted second degree murder based on sudden and intense passion does not exist), *appeal allowed* (1993), 152 Ill. 2d 571; *People v. Aliwoli* (1st Dist. 1992), 238 Ill. App. 3d 602, 606 N.E.2d 347 (offense does not exist under either theory); *People v. Williams* (1st Dist. 1991), 220 Ill. App. 3d 460, 581 N.E.2d 113 (attempted second degree murder based on imperfect self-defense does not exist).) In *People v. Moore* (1990), 204 Ill. App. 3d 694, 562 N.E.2d 215, this court held that the offense of attempted second degree murder based on sudden and intense passion does exist. Arguably, under the rationale employed in *Moore,* the offense of attempted second degree murder based on imperfect self-defense also exists. We need not resolve this particular issue, however, because we find that defendant was not prejudiced by counsel's failure to tender such an instruction.

■ To prevail on a claim of ineffective assistance of counsel, the defendant must show that his counsel's conduct was deficient and that there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. (*Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) For the jury in this case to find that defendant was guilty of attempted second degree murder, it would have had to determine that the defendant subjectively believed that the circumstances required the use of deadly force as a means of self-defense, but that belief was objectively unreasonable. (See *Turcios*, 228 Ill. App. 3d 583, 593 N.E.2d 907.) Given the defendant's testimony at trial in which he repeatedly stated that he was not afraid of Foster, he did not think Foster was about to use force, and he did not perceive Foster as a threat, we believe it is manifestly clear that there is no reasonable probability that the defendant would have been convicted of attempted second degree murder. Since defendant was not prejudiced by the alleged error, his claim of ineffective assistance of counsel must fail. See *Turcios*, 228 Ill. App. 3d 583, 593 N.E.2d 907 (rejecting ineffectiveness claim based on failure to tender instruction where evidence showed no reasonable probability that defendant would be convicted of attempted second degree murder); *Austin*, 215 Ill. App. 3d 323, 574 N.E.2d 1297 (same).

■ Defendant next contends, and the State agrees, that one of his two convictions must be vacated because they are both based on the same act. (See *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) Count I of the amended information charging defendant with first degree murder alleged that he, with the intent to kill, shot Foster in the face with a shotgun. Count II of the amended information charging defendant with aggravated battery with a firearm alleged that defendant caused bodily harm to Foster by shooting Foster in the face with a shotgun. Thus, both convictions were carved from the same physical act. Where two convictions are based upon a single act, the defendant should be sentenced only for the most serious offense. (*People v. Pistonbarger* (1990), 142 Ill. 2d 353, 568 N.E.2d 783.) We therefore vacate the conviction and sentence for the offense of aggravated battery with a firearm. We reject, however, defendant's request that we vacate his sentence for attempted murder and remand for a new sentencing hearing. Our review of the record does not indicate that the court was influenced by the vacated conviction in imposing sentence on the attempted murder conviction, and we find it unnecessary to remand for resentencing. See *People v. Payne* (1983), 98 Ill. 2d 45, 456 N.E.2d 44; *Turcios*, 228 Ill. App. 3d 583, 593 N.E.2d 907.

Finally, defendant maintains that the trial court erred in finding that he was eligible for an extended-term sentence on the basis that the offense was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(b)(2)). We agree.

While a determination that a defendant's conduct constitutes exceptionally brutal or heinous behavior indicative of wanton cruelty will not be disturbed absent an abuse of discretion (*People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025), the statutory provision authorizing extended-term sentences "was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence" (*People v. Evans* (1981), 87 Ill. 2d 77, 88-89, 429 N.E.2d 520, 525). Conduct is "heinous" if it is hatefully or shockingly evil, grossly bad, or enormously and flagrantly criminal; "brutal" conduct is grossly ruthless, devoid of mercy or compassion or cruel and cold-blooded. (*People v. LaPointe* (1982), 88 Ill. 2d 482, 431 N.E.2d 344.) Moreover, the extended-term provision applies only to offenses accompanied by "exceptionally" brutal or heinous behavior. *Andrews*, 132 Ill. 2d 451, 548 N.E.2d 1025.

In finding that defendant was eligible for an extended-term sentence, the trial court reasoned:

"Now, what is exceptionally brutal or heinous behavior indicative of wanton cruelty? It does not necessarily indicate the end result. The fact Mr. Foster's eye is now gone or he is blind or nearly blind does not mean that that necessarily was indicative of wanton cruelty. What makes this crime brutal and heinous is the attitude of the Defendant toward an innocent person who walks the streets of Joliet, that is walking in broad daylight down the street and to be opened up on by a shotgun by someone for no reason. The Court, in hearing the testimony during the trial, finds that there was no reason, whatsoever, for any individual on the streets of Joliet at that time to be confronted by Mr. Cunningham for any justification, whatsoever. It's his attitude toward any person, not necessarily Mr. Foster, but just the attitude that he had toward any person who would have had the misfortune of walking down the street at that time and not to have been personally known by Mr. Cunningham, that is what makes this crime exceptionally brutal—Mr. Cunningham's behavior."

■ We agree with the trial court that there was "no reason" for the defendant to shoot Foster and that the shooting was a senseless act of random violence. We do not believe, however, that these cir-

cumstances warrant a finding of exceptionally brutal or heinous behavior indicative of wanton cruelty. In *People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025, the victim and his girlfriend were stopped at a traffic light when the defendant entered their car and pointed a gun at them. The victim told the defendant to "be cool, we'll give you what you want." The defendant then shot the victim in the temple, killing him. Afterwards, the defendant hit the victim's girlfriend in the eye with his gun and ordered, "Give me your money, bitch." In finding that the trial court abused its discretion in sentencing the defendant to an extended term, our supreme court stated:

> "Although the victim was defenseless and the defendant could have achieved his goal of robbing the victim and the victim's girlfriend without killing the victim, every single murder is by nature unnecessary; section 5—5—3.2(b)(2), however, requires that the murder be 'exceptionally' brutal or heinous. All murders are brutal and heinous to a certain degree. Moreover, many murdered robbery victims are defenseless when killed. Section 5—8—2, however, allowing for extended-term sentences, 'was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence.' "
> *Andrews*, 132 Ill. 2d at 465-66, 548 N.E.2d at 1032, quoting *People v. Evans* (1981), 87 Ill. 2d 77, 88-89.

While defendant's conduct in this case, like that of the defendant in *Andrews*, could fairly be characterized as brutal, we do not believe that it rises to the level of exceptional brutality required by the extended-term statute. (Cf. *People v. Reiner* (1993), 251 Ill. App. 3d 1065; *People v. Fields* (1990), 198 Ill. App. 3d 438, 555 N.E.2d 1136.) We therefore find that the trial court abused its discretion in imposing an extended-term sentence. Accordingly, pursuant to the authority granted by Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we reduce the defendant's sentence for attempted first degree murder to 30 years' imprisonment, the maximum nonextended sentence allowable for a Class X felony.

For the reasons stated above, the defendant's conviction for attempted first degree murder is affirmed, and his sentence is modified to a term of 30 years' imprisonment. The defendant's conviction and sentence for aggravated battery with a firearm are vacated.

Affirmed in part as modified; vacated in part.

McCUSKEY, P.J., and STOUDER, J., concur.