THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VINCENT WILLIAMS, Defendant-Appellant.

First District (3rd Division)   No. 1—89—1515

Opinion filed September 27, 1991.

Blair, Russell & Cole, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Stephen Ferrucci, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

After a jury trial, defendant Vincent Williams was convicted of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2 ) and attempted second degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4(a), 9—2). Before the trial began, the State nol-prossed three counts of aggravated battery. (Ill. Rev. Stat. 1987, ch. 38, par. 12—4.) Defendant received concurrent sentences of seven years' imprisonment on the attempted second degree murder and 30 years' imprisonment on the armed violence. On appeal, defendant asserts that (1) the

armed violence conviction and sentence should be vacated because it arose from the same act as his conviction for attempted second degree murder; (2) the attempted second degree murder conviction is void under Illinois law; and (3) the second degree murder statute is unconstitutional because it improperly shifts the burden of proof onto the defendant.

On July 18, 1987, about 11:30 p.m., Illinois State Trooper Dennis Galle was in a service station at California and Diversey Avenues in Chicago. Galle, who was in full summer uniform, was preparing to leave the station when a car came screeching into the station with its horn blaring, and crashed into the side of the building. Hearing the driver yell for help, Galle approached the car on the driver's side. When he was 3½ to 4 feet from the rear of the driver's window, Galle looked into the car and asked, "What's the problem here?" Galle then saw defendant, who was the passenger, raise a gun, lean forward in his seat, extend his arm in front of the driver, and fire the gun at Galle. As defendant raised the gun, Galle stepped back and turned to his left.

After the shot, Galle did not realize he was hit. He saw some movement inside the car, drew his gun, and shouted, "Hold it right there." The driver, Nebkhepera Khuenaten, also known as Hru, handed the .38 caliber gun to Galle, who ordered both men out of the car and to lie facedown on the ground. By that time, Galle realized that he had been shot, and yelled to the people in the service station to call the police and an ambulance.

At that point, a passerby approached the trooper and offered his help. The trooper gave him a gun, and told him to stay with the two men and not to let them get away. Galle went to his squad car to radio for help. Within a few minutes, Chicago police arrived, took the gun from the passerby, and handcuffed defendant and Hru. Hru told one of the police officers there was another gun under the driver's seat. Searching the car, the police found a loaded .22 caliber automatic gun. Hru was charged with unlawful use of weapons, but the charges were later dropped.

Galle was taken to the hospital, where he underwent surgery. Eventually, Galle underwent six operations, and returned to work one year later.

Police officer Thomas Bachelder, an evidence technician, testified that there was a bullet hole in the driver's side front door through which a bullet entered from the inside and exited on the outside. Bachelder also stated that there was broken window glass inside the car and that the door rattled when moved. Detective Richard Schak testified that he

determined through measurements that the bullet went from the front to the rear of the door. Richard Fournier, a Chicago police firearms examiner, testified that the bullet removed from Galle was fired from the .38 caliber gun removed from the crime scene.

Cesar Vargas, an employee at the service station, testified that, after the crash, he went outside toward the car. He saw the passenger raise a gun, extend his arm toward Galle's waist, and shoot Galle as Galle stood near the driver's side door.

Hru and defendant both testified to the events leading up to the shooting. They met in a gay bar approximately two weeks earlier. At that time, defendant explained to Hru that he was a hustler; that is, he was paid by homosexuals for relationships. That night, defendant and Hru agreed that Hru would pay defendant for talking together. No sexual relationship or friendship was contemplated. For approximately two weeks, defendant stayed at Hru's home on and off, and returned to the gay bar at night to hustle money. On July 17, 1987, the two men agreed to not continue seeing each other, and Hru drove defendant back to Chicago.

From that point, the two men disagree about what occurred. Hru testified that he noticed his loaded .38 caliber gun was missing from his bedroom on July 18, 1987. That day, he drove to his parents' home in Chicago, got a .22 caliber automatic gun from his brother, put it on the side of his car's driver's seat near the door, and drove to the gay bar about 11 p.m. There, he approached defendant and told him to stay away from his house. Hru testified that he was not actually kicking him out and would help defendant if he needed money. Hru stated that he previously had given defendant $80 to $100.

When Hru left the bar, defendant followed him to his car and asked for a ride to Kedzie and Belmont Avenues. The two men got into the car. Once they were on the Kennedy Expressway, Hru testified that defendant showed him the .38 caliber gun and said, "[Y]ou probably was [sic] looking for this." Hru answered "yes." Defendant then began yelling that Hru had dumped him and was just like everyone else, using him and other things. Hru pulled over to the side and tried to calm defendant. All of a sudden, defendant shot the gun at the driver's side window. The window, which was partially raised, shattered. Defendant then told Hru to drive to Gary. Hru exited at Diversey Avenue. When he was at the stoplight at California and Diversey Avenues, Hru noticed a State Trooper's car parked in front of a service station. Hollering out the window "help me" and blowing the horn, Hru stepped on the accelerator, sped toward the station, and ran into the side of the building.

As Hru saw Galle through the side view mirror, defendant took the gun, reached in front of Hru, and shot Galle through the window. Hru grabbed defendant's wrist, and the two men wrestled. When Galle yelled "hold it right there," defendant relaxed his grip on the gun. Hru took the gun and handed it to Galle. Both men got out of the car, lay facedown on the ground, and were later handcuffed.

Defendant testified that he went to Hru's car on July 18, 1987, to talk. When he got to the car, defendant saw a gun on the front seat. Hru picked up the gun and told defendant to sit down before he did something he would regret. When defendant asked, "[W]hat, are you crazy[?]" Hru pointed the gun at defendant and cocked it. Defendant got into the car, and Hru began driving. On the expressway, Hru was yelling that defendant had dumped him and was like everyone else. At that time, the gun was in Hru's lap, but defendant did not try to get it away from Hru. Defendant testified that he asked Hru to pull over, and Hru drove off the exit. Just before a stoplight, defendant grabbed the gun. Hru looked at defendant and stared at the gun. Then, he accelerated the car, and the car hit the side of the building.

Defendant hit his head on the windshield and fell back in the seat. The gun was at his right side between his leg and the door. When he lifted his arm about mid-stomach level, Hru jumped and grabbed defendant's arm. To get Hru off of him, defendant thought about shooting Hru in the shoulder. Hru and defendant struggled, and the gun went off. Defendant did not know if he pulled the trigger, but his finger was on the trigger when it fired. Defendant did not see Galle and was not aiming at him. Defendant also testified that the shot was accidental while he was arguing with Hru. After the shot, Hru yelled "you shot a cop," and defendant told him to shut up. Defendant then dropped the gun and got out of the car. Once outside the car, Galle told him to lie facedown on the ground, which he did.

The jury found defendant guilty of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2) and attempted second degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4(a), 9—2). After hearing aggravating and mitigating factors, the trial judge sentenced defendant to concurrent sentences of 30 years' imprisonment on the armed violence and seven years' imprisonment on attempted second degree murder.

■ On appeal, defendant contends that attempted second degree murder is void under Illinois law. The State agrees. The Illinois Supreme Court in *People v. Reagan* (1983), 99 Ill. 2d 238, ruled that there was no such crime as attempted voluntary manslaughter based on an imperfect self-defense. Although *Reagan* was decided under the former voluntary manslaughter statute, its rationale still applies. The

former voluntary manslaughter statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) and the present second degree murder statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—2) are similar except for the burden of proof of the mitigating factor. Voluntary manslaughter required the State to prove the mitigating factor beyond a reasonable doubt while second degree murder requires the defendant to prove the mitigating factor by a preponderance of the evidence. *Reagan* held that attempted murder required proof that defendant intended to kill without lawful justification. (99 Ill. 2d at 240.) Attempted voluntary manslaughter, however, would require the defendant to specifically intend to kill with an unreasonable belief in the need to use deadly force in self-defense. (*Reagan*, 99 Ill. 2d at 240.) Since it is impossible to intend an unreasonable belief, the court ruled, attempted voluntary manslaughter based on imperfect self-defense did not exist. (*Reagan*, 99 Ill. 2d at 240.) Similarly, attempted second degree murder based on an imperfect self-defense does not exist. Therefore, defendant's conviction for attempted second degree murder is vacated.

Although the Third District of the Appellate Court recently decided in *People v. Moore* (1990), 204 Ill. App. 3d 694, that attempted second degree murder based on sudden and intense passion does exist, that decision does not have any effect on this case.

■ Defendant also asserts that the second degree murder statute is unconstitutional because it improperly shifts the burden of proving the mitigating factor to the defendant. Because attempted second degree murder is not an offense in Illinois and defendant's attempted second degree murder conviction is vacated, the issue is moot.

■ Defendant then argues that the armed violence conviction and sentence should be vacated because they arose from the same act as his conviction for attempted second degree murder. Where the same physical act constitutes two or more offenses, a conviction and sentence are proper on only the most serious of the offenses. (*People v. King* (1977), 66 Ill. 2d 551, 561.) Defendant would be correct and we would end our analysis here, except that defendant's attempted second degree murder conviction is vacated. Since defendant's only remaining conviction is for armed violence, his argument that he cannot be convicted of two crimes for the same act cannot stand. On that basis, defendant's armed violence conviction is affirmed.

■ Defendant also argues, however, that his armed violence conviction must be vacated based on the implicit findings in his attempted second degree murder conviction. Armed violence does not apply to voluntary manslaughter convictions (*People v. Alejos* (1983), 97 Ill. 2d 502) or involuntary manslaughter convictions (*People v.*

*Fernetti* (1984), 104 Ill. 2d 19). Even if the armed violence is predicated on the underlying offense of aggravated battery, the defendant cannot be convicted of armed violence when he is also convicted of voluntary manslaughter arising out of the same facts. (*People v. Clay* (1987), 165 Ill. App. 3d 68, 71.) Furthermore, the prosecution cannot avoid the effects of *Alejos* and *Fernetti* by charging defendant with armed violence predicated on aggravated battery and voluntary manslaughter, and receiving convictions on both charges. *Clay*, 165 Ill. App. 3d at 71.

Furthermore, defendant argues that the recent Illinois Supreme Court decision in *People v. Drakeford* (1990), 139 Ill. 2d 206, provides a separate and independent basis for vacating the armed violence conviction. Defendant contends that, based on the court's rationale in *Drakeford*, the jury's guilty verdict for attempted second degree murder is incompatible with an armed violence conviction.

Defendant maintains that the jury found that the evidence did not establish attempted first degree murder. Instead, they returned a guilty verdict on attempted second degree murder based on the mitigating factor of an actual, but unreasonable belief in his right to use deadly force. Defendant asserts that the only difference between this case and *Drakeford* is that the victim in *Drakeford* died. Defendant maintains that the underlying rationale, however, is applicable to this case. In both cases, a jury found the defendant's conduct to be the result of an unreasonable belief in the right to use deadly force. The *Drakeford* court held that the armed violence statute did not apply under those circumstances. 139 Ill. 2d at 215.

The State attempts to distinguish *Drakeford* by contending that defendant here was charged with attempted first degree murder. The State maintains that throughout the trial, the evidence established that defendant's actions were intentional and premeditated. If defendant had not been armed, the State argues, Galle would not have been injured or would have received less serious injuries. Therefore, the State concludes, the purpose of the armed violence statute in preventing more serious harm is properly served, and the *Drakeford* rationale does not apply.

What defendant was charged with, however, is irrelevant. Rejecting the State's argument that defendant's actions were intentional and premeditated, the jury did not find defendant guilty of attempted first degree murder. Instead, the jury found that defendant was acting under an actual, but unreasonable belief that he had the right to use deadly force. Furthermore, the defendant in *Drakeford* was also charged and tried for first degree murder, but convicted of second de-

gree murder. (139 Ill. 2d at 209.) Like this case, the *Drakeford* jury found that the defendant's conduct was unpremeditated, undeterable, and caused by an actual but unreasonable belief that the circumstances required the use of deadly force. 139 Ill. 2d at 213-14.

■ Second degree murder is an unpremeditated crime, induced by sudden fear or duress, and committed without time for proper reflection. (*Alejos*, 97 Ill. 2d at 507.) Because second degree murder is committed with no planning and no prior intent to commit a crime, it is not as serious as a homicide, which comes from criminal deliberation or design, nor is it likely to be deterred by the threat of punishment as is a killing which results from planned criminal acts. *Alejos*, 97 Ill. 2d at 507.

Because the chances that violence will erupt and cause great bodily harm are increased when a felony is committed with a weapon, the armed violence punishment is intended to deter a criminal from carrying a weapon while committing a felony. (*Alejos*, 97 Ill. 2d at 508-09.) Someone who commits second degree murder, however, does not intend in advance to take a life or to use deadly force. (*Alejos*, 97 Ill. 2d at 509.) Instead, without deliberation and usually instantaneously, he decides to use force capable of killing. (*Alejos*, 97 Ill. 2d at 509.) Before that decision is made, the person guilty of second degree murder typically has no criminal intent at all. (*Alejos*, 97 Ill. 2d at 509.) The deterrent aspect of the armed violence statute, which is to prevent more serious harm when a felony is committed with a dangerous weapon, cannot be served when the defendant's act is unpremeditated, as in second degree murder. *Drakeford*, 139 Ill. 2d at 213-14.

Defendant also relies on *Drakeford* to assert that the State cannot use the armed violence statute to enhance the penalty. Because the same intent or knowledge is required for convictions for both second degree murder and aggravated battery causing great bodily harm, the *Drakeford* court stated that the second degree murder statute would be nullified if the defendant was sentenced for both crimes. (139 Ill. 2d at 215-16.) Consequently, the court concluded that the defendant could not be sentenced for armed violence predicated on aggravated battery where there was a simultaneous conviction for second degree murder arising out of the same act. *Drakeford*, 139 Ill. 2d at 215-16.

■ In this case, however, the attempted second degree murder conviction is vacated. Therefore, there is only one conviction, which is for armed violence predicated on aggravated battery causing great bodily harm. Consequently, the *Drakeford*, *Alejos*, and *Fernetti* cases are not controlling.

Based on the foregoing, defendant's conviction for attempted second degree murder is vacated and his conviction for armed violence is affirmed.

Vacated in part; affirmed in part.

RIZZI and GREIMAN, JJ., concur.