THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMALJAH ALIWOLI, Defendant-Appellant.

First District (3rd Division) No. 1—89—1052

Opinion filed November 12, 1992.

604

Rita A. Fry, Public Defender, of Chicago (Lisa S. Ottenfeld, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

Jamaljah Aliwoli was found guilty but mentally ill on three counts of attempted first degree murder in the shooting of three Chicago police officers. He was sentenced to 60 years, 30 years and 30 years to run consecutively.

Defendant argues that the trial court erred: (1) in allowing the prosecutor to incorrectly state the law, introduce inadmissible evidence, make personal attacks on the defendant and defense counsel, and incite the jury's passion with religious and racial prejudice; (2) in rejecting defendant's tendered instructions which state the consequences of a not guilty by reason of insanity (NGRI) verdict and included the offense of attempted second degree murder; (3) in allowing the jury to hear the "911" tape without proper foundation where the tape was partially unintelligible and the contents were irrelevant and inflammatory; and (4) in abusing its discretion in sentencing defendant to 120 years in prison.

On March 29, 1988, defendant was arrested in connection with the shooting of Chicago police officers Daniel Duffy, Gregory Matura and Dennis Mertz. On that day, Officers Duffy and Matura were in their marked squad car when Duffy observed a taxi pass a stopped school bus that had its red lights on and its stop sign extended. When the officers attempted to curb the driver, defendant Jamaljah Aliwoli, he initially refused to stop but finally pulled over after two blocks.

Upon Officer Duffy's request, defendant exited the cab and stood behind it to stay out of the way of traffic. Officer Duffy in-

formed the defendant that he had been stopped for unlawfully passing a school bus and asked to see defendant's driver's license. Defendant then reached into his jacket in a manner that led both officers to believe he was drawing a weapon from a shoulder holster. The officers drew their guns, ordered defendant to remove his hand from his coat and he complied. As Officer Duffy began a body search, defendant yanked his right arm away, pushed Duffy and then began punching Officer Matura in the head. Officer Duffy grabbed defendant from behind and directed Officer Matura to call for assistance.

As Officer Matura called for help, he saw the defendant withdraw a chrome-plated revolver from a shoulder holster he wore underneath his jacket. Officer Matura then attempted to restrain defendant and retrieve defendant's gun while Officer Duffy still held defendant from behind. Defendant shot Officer Matura, and the bullet passed through the officer's hand. Defendant then lifted Duffy off his feet and Duffy saw that defendant still had a gun pointed at Officer Matura, approximately one foot away from his head. Officer Duffy grabbed defendant's wrist as he fired, averting a second shot from hitting Officer Matura, but defendant then wrested himself away from Duffy, spinning and shooting Duffy once in the chest as Duffy attempted to withdraw his own revolver.

After Officer Duffy, who was wearing a safety vest, fell to the ground on all fours and dropped his gun, defendant then shot Duffy two times in the lower back and buttocks as Duffy attempted to run to safety. Defendant picked up Duffy's gun, exchanged more shots with Officer Matura, then chased Matura down the street. Officer Duffy drew a second gun and fired five shots at defendant, who returned two shots. Officer Matura had reloaded his gun and fired more shots at defendant, who then ran back towards Duffy. Officer Duffy then ran to the intersection of 69th and Elizabeth Streets and fell in front of Ann Claxton, a passerby, who told him to stay down between two parked cars. A moment later, defendant reappeared, going from one side of the street to the other, with his gun pointed, looking for Duffy. Ms. Claxton got his attention and pointed, falsely indicating that Duffy had gone in the opposite direction. Defendant then reentered his taxi, again looked at Ms. Claxton, who repeated her earlier indication and defendant drove off in that direction.

Another police car gave chase while a second car attempted to block defendant's path. Defendant drove past the second police car, firing shots at Officer Mertz and wounding him in the hand and leg.

After defendant's car veered into a park, crashed into a building and came to a stop, defendant continued to fire at police who approached. Defendant then slumped over, having been shot four times in the arms, neck and chest. Officer Martinez disarmed defendant and observed that he wore a black shoulder holster and carried a chrome-plated revolver.

Dr. Phyllis Amabile testified for defendant, stating that she conducted an examination of him and in her opinion, he suffered from a delusional disorder of a persecutory type focusing on the Chicago police department and, to a lesser extent, his co-workers at the cab company. Dr. Amabile described the condition, which she estimated defendant had had for approximately 12 to 14 years, as a persistent but not bizarre belief that he is being followed, maligned and persecuted or harassed in some way, despite the fact that there is no reasonable evidence to support that belief. Dr. Amabile based her opinion on psychological tests and reports and an interview with defendant. The doctor testified that reports indicated that defendant became estranged from his family when he became a Black Muslim. While the doctor did not ask defendant if his beliefs as a Black Muslim had an impact on his dealings with police, she found that his paranoia was not instilled in him by his religious beliefs. Dr. Amabile believed defendant to be insane at the time of the shooting but fit to stand trial.

Drs. Steven Patt and Robert Reifman also testified for defendant and formed substantially the same opinion as Dr. Amabile. They believed that defendant was not creating a mental illness in order to escape responsibility for his actions. They both found defendant legally insane at the time of the shooting.

Dr. Henry Lahmeyer, a physician and psychiatrist, testified for the prosecution, stating that he examined defendant and heard defendant describe the same incidents with the police that the other doctors related, but that he did not believe defendant was insane at the time of the shooting, despite defendant's concern about the police. Dr. Lahmeyer based his opinion on the fact that defendant had never before acted upon his supposed delusions of persecution. The doctor thought it significant that defendant had, at various times prior to the shootings, gone to the police for aid, such as when his car was stolen. Dr. Lahmeyer further noted as important that defendant had no prior psychiatric history and that the hospital which held him for observation after the shootings never reported any evidence of psychotic behavior or thought patterns.

At trial, defendant acknowledged the shootings but denied that he was insane at the time. He testified that there existed a conspiracy among some police officers to kill him. He believes that the conspiracy began in 1970 when he shot at two officers. Defendant believes that police have broken into his house, stolen his car and slashed his tires, even though he did not see these acts committed. Defendant acknowledged that he served six years in prison for shooting at police officers.

Defendant first contends that the prosecutor misrepresented the law to the jury in his closing argument by implying that an NGRI verdict would allow defendant to "walk out the door a free man." The prosecutor stated, "What they are trying to do ladies and gentlemen is flimflam you so that he can go laughing out that door of this courtroom." When defense counsel objected, the court overruled the objection.

Upon rebuttal, the State further argued:

"I am not going to tell you that the defendant will walk out the door at any point because I don't think you'll get that far in your deliberations.

\* \* \*

To buy the defense of mental disorder in this case would basically say that all you have to do is commit an outrageous crime, such as the attempted murder of three Chicago police officers, find one or more psychiatrists who are willing to believe it and you are home free."

Defendant contends the State knowingly misstated the law, and such misstatement was exacerbated by the court's refusal to instruct the jury on the consequences of an NGRI verdict.

A prosecutor is given great latitude in making closing arguments, and the trial court's determination of the propriety of the argument will stand absent a clear abuse of discretion. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970.) While a prosecutor may not make arguments or assumptions which have no basis in evidence, improper comments or remarks are not reversible error unless they are a material factor in the conviction or result in substantial prejudice to the accused. *People v. Tipton* (1990), 207 Ill. App. 3d 688, 699-700, 566 N.E.2d 352.

Where there are allegations of prosecutorial misconduct, arguments of both the prosecutor and defense counsel must be reviewed in their entirety, and complained-of comments must be placed in their proper context. *Tipton*, 207 Ill. App. 3d at 701.

■ We first find that defendant has waived argument regarding the prosecutor's remarks upon rebuttal since he failed to object to them during trial. *People v. Reid* (1990), 136 Ill. 2d 27, 38, 554 N.E.2d 174; *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

We examine the other remarks in context of the entire record, including the fact that the jury was properly instructed that it could find defendant not guilty, not guilty by reason of insanity, guilty, or guilty but mentally ill. While the prosecutor's remarks were an inappropriate attempt to persuade the jury to find defendant guilty, we determine that there was no substantial prejudice to defendant's rights.

Further, defense counsel in his closing argument asked the jurors to "hold [defendant] responsible and brand him as an insane person suffering from a dangerous mental illness. *** These police officers as they sit right before you won't be in danger of this man ever again." The trial court overruled the State's objections to the argument, allowing the jury to infer from defense counsel's statement that defendant would not be immediately released if he were found not guilty by reason of insanity.

The trial court also instructed the jurors as to the burden of proof and the fact that they were not to concern themselves with the ultimate disposition of the case. The evidence supporting the jury's verdict of guilty but mentally ill is certainly overwhelming.

Defendant cites *People v. Stack* (1984), 128 Ill. App. 3d 611, 470 N.E.2d 1252, *People v. Wilson* (1983), 120 Ill. App. 3d 950, 458 N.E.2d 1081, and *United States ex rel. Alerte v. Lane* (N.D. Ill. 1989), 725 F. Supp. 936, in which prosecutorial remarks were held improper. However, we find the present case distinguishable.

While the *Wilson* court found improper the prosecutor's repeated statements during closing arguments that defendant would automatically be released if he was found not guilty by reason of insanity, the court's decision to reverse rested upon the fact that defendant's expert witnesses were excluded from testifying. (*Wilson*, 120 Ill. App. 3d at 960.) We find no similar situation in the present case.

In *Stack*, the prosecutor repeatedly remarked that society would "have to live with" defendant if the jury allowed him to escape responsibility. That court appears to have erroneously relied upon *Wilson* that any such remarks made by the prosecutor are improper and would be error (*Stack*, 128 Ill. App. 3d at 620), a proposition

with which we disagree, given our duty to examine the remarks in the context of the entire record. *Tipton*, 207 Ill. App. 3d at 701.

The United States District Court reversed *Alerte* on a *habeas* plea where it found reversible error in the prosecutor's repeated statements that defendant's insanity defense was a sham and that finding him guilty of murder instead of not guilty by reason of insanity would be the "one deterrent" that would stop defendant from murdering others. The court determined that the remarks were not invited by the defense, that the first two remarks came before defense counsel's closing argument, that objections to the comments were not sustained and that defense counsel was not allowed to effectively respond to the comments. *Alerte*, 725 F. Supp. at 943.

We find defendant's case distinguishable since here the trial judge allowed both sides latitude in their closing arguments. Defense counsel was allowed to argue to the jury that defendant would not walk free even if he were found not guilty by reason of insanity.

In reviewing the evidence and the comments in the context of the entire record, we find defendant was not substantially prejudiced by the prosecutor's comments.

Defendant also contends that the prosecutor improperly remarked in his closing argument that defense counsel used trickery and that defendant lied. Defendant alleges that the comments were not based upon the evidence, inflamed the passion of the jury and denied him a fair trial.

The assistant State's Attorney argued to the jury:

> "Don't be flimflammed by this insanity self-defense mixture that they are trying to whip by you. *** [They are trying to] whip a game on you here, to try and trick you and confuse you *** [they are trying to] flimflam you so that he can go laughing out that door of this courtroom."

In their closing, defense counsel refuted the prosecutor's remarks and pointed out that all four experts thought defendant was not fabricating a mental disorder.

Upon rebuttal, the State argued that defendant's testimony was a "master performance" which he had rehearsed, that it was a game "from the first doctor."

It is improper for a prosecutor to accuse defense counsel of attempting to create confusion or of fabricating a defense. (*People v. Harris* (1989), 129 Ill. 2d 123, 160, 544 N.E.2d 357.) However, a prosecutor is entitled to comment on the evidence, draw inferences

therefrom, and comment on the accused's credibility. (*People v. Manley* (1991), 222 Ill. App. 3d 896, 910, 584 N.E.2d 477; *People v. Spiezio* (1989), 191 Ill. App. 3d 1067, 1075, 548 N.E.2d 561.) Again we are mindful that we must examine the comments in the context of the entire record. *Tipton*, 207 Ill. App. 3d at 701.

■■ While defense counsel maintained an insanity defense, at trial defendant testified that his actions toward the police were in self-defense, although we find no facts to justify such a conclusion. The prosecutor could properly comment on the contradictory nature of the two defenses and defendant's credibility.

It is not reversible error for a prosecutor to characterize a defendant as a liar where proof of guilt is supported by substantial evidence. *People v. Green* (1991), 209 Ill. App. 3d 233, 246, 568 N.E.2d 92; *People v. Stiff* (1989), 185 Ill. App. 3d 751, 757, 542 N.E.2d 392.

During the commission of the crime, defendant obeyed the commands of the officers to remove his hand from inside his jacket and he understood and acted responsively to what Ann Claxton told him. Because the evidence demonstrated that defendant's actions during the course of the crime appeared to contradict his insanity defense, the State could properly argue that it was a reasonable inference that defendant was lying. (*People v. Carter* (1988), 177 Ill. App. 3d 593, 601, 532 N.E.2d 531; *People v. Strange* (1984), 125 Ill. App. 3d 43, 46, 465 N.E.2d 616.) There is an evidentiary basis that contradicts defendant's theory, and we believe the prosecutor's remarks do not serve as an appropriate basis for reversal.

Defendant next argues that the State used his race and religion to inflame the passions of the jury against him. Defendant contends that the State improperly implied that he shot the officers because of his Black Muslim beliefs.

In opening argument, the State announced that defendant was a Black Muslim. Later, the assistant State's Attorney questioned Drs. Amabile and Reifman regarding defendant's religious beliefs.

When the State asked Dr. Amabile if defendant's Black Muslim religion encompassed an anti-authority stance, she disagreed with that idea. The State asked several other questions of Dr. Amabile relating to Black Muslims and their views of the police, but the doctor denied any inference that defendant's religion may have provided a motive for the shootings.

In its cross-examination of Dr. Reifman, the State asked if he was familiar with a 1984 article in American Psychologist Publication regarding African-Americans' socialization in American society.

The State inquired whether the doctor was familiar with the article which the assistant State's Attorney described as stating that African-Americans have a "healthy cultural paranoia" and that they view every white person "as a potential enemy and every social system [as] an opponent." Dr. Reifman stated that he was not familiar with that article and did not agree with that statement.

The prosecutor continued to question Dr. Reifman regarding African-Americans and what defendant had told him about his Muslim faith. The doctor stated that he had interviewed many African-Americans and many paranoids in 25 years and that he found defendant to be a typical paranoid with delusions. Dr. Reifman specifically stated that he did not find defendant's religion to be a pertinent factor in the shootings, that defendant was motivated by his delusions that all police officers, both African-American and white, were involved in a conspiracy against him.

The State also cross-examined defendant about his religion, whether Black Muslims thought of white people as devils, whether defendant knew that in the late 1960s and early 1970s, the Black Muslim newspaper, *Muhammad Speaks*, referred to police as "pigs." Defendant replied that while he did not read that paper, he was aware that police have been referred to as such, but denied ever hearing a Muslim use it. Defendant also testified on cross that his religion taught him to treat everyone peacefully and fairly.

Defendant contends that the State's questions were intended to inflame prejudice in the jury and defendant was denied due process because of them.

A prosecutor may not attempt to arouse racial fear or animosity to malign a defendant who is black. *People v. McKay* (1985), 138 Ill. App. 3d 446, 138 N.E.2d 446; *People v. Lurry* (1979), 77 Ill. App. 3d 108, 395 N.E.2d 1234.

However, the defendant has put his mental state in issue and wide latitude is allowed in the cross-examination of an expert witness and there is a broad scope of inquiry into the basis of an expert's opinion. (*People v. Wheeler* (1990), 194 Ill. App. 3d 178, 550 N.E.2d 1170.) An expert may be cross-examined for the purpose of explaining, modifying or discrediting the expert's testimony, or to determine which factors were taken into account and which ones were disregarded in arriving at a conclusion. *People v. Williams* (1991), 214 Ill. App. 3d 499, 510-11, 574 N.E.2d 62; *People v. Fields* (1988), 170 Ill. App. 3d 1, 14, 523 N.E.2d 1196.

Although defendant failed to object to the disputed line of questioning regarding Dr. Amabile, we will examine this issue under the plain

error rule. (*Reid*, 136 Ill. 2d at 38.) We find that the State's questions of Dr. Amabile did not prejudice the jury against defendant or deny him due process. The questions regarding defendant's religion properly followed from the doctor's testimony that defendant's family stated that his conversion to the Black Muslim religion appeared to create a change in his personality and caused him to be estranged from them. In an attempt to explain the doctor's opinion, the State then inquired whether Dr. Amabile had taken defendant's religion into account in her psychiatric examination, as suggested by the psychiatric tests upon which the doctor based her findings. Any improper insinuation by the State that defendant's religion *per se* caused him to be hostile to authority figures was emphatically denied by Dr. Amabile.

In reviewing the State's cross-examination of Dr. Reifman, defendant argues that *People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 457, is analogous. In *Lampkin,* the supreme court reversed defendant's conviction for three counts of murder where the State introduced evidence that defendant, upon his arrest six years prior, had said "You white honky coppers are [expletive deleted] with us now, and we will get you later." (*Lampkin*, 98 Ill. 2d at 424.) The court held that the remarks should have been excluded because they had no probative value since they were not directed toward anyone in particular and were likely to arouse prejudice in the jury. *Lampkin*, 98 Ill. 2d at 428.

■ However, we find the present case distinguishable for two reasons. First, the remark in *Lampkin* was gratuitous. It had no relevance to the issues of the case and could not have provided insights to the jury about the defendant. However, in the case at bar, defendant has put his mental state at issue, allowing the prosecutor wide latitude to explore defendant's mental processes with each expert. Second, any possible prejudice engendered by the State's questions was sufficiently defused by Drs. Amabile's and Reifman's consistent and adamant denials that defendant's affiliation with Black Muslims influenced him to shoot the officers and the trial court's jury instruction to ignore defendant's race and religion in reaching a verdict.

We also determine that the cross-examination of defendant was not grounds for reversal. In the total context of the testing of the expert witnesses, we believe that the basis for the State's questioning of defendant regarding his Black Muslim beliefs was to establish a motive for defendant's crime and to test the validity of the psychiatric examinations upon which the experts relied. We give credence to this view since the State never mentioned defendant's reli-

gion in closing argument, where any statements intended as prejudicial would likely have their greatest impact upon the jury.

Defendant admits the shootings and the experts on both sides were unanimous in their opinion that defendant suffers from a delusional disorder regarding the police. Paralleling the testimony of Drs. Amabile and Reifman, defendant categorically denied any inference by the prosecution that his religion influenced him to violence.

The trial judge was in the best position to observe the demeanor, mood and tone of the prosecutor during the disputed cross-examination and determine whether it was hostile or merely seeking explanation of the expert's opinions. (See *United States v. Hernandez* (7th Cir. 1989), 865 F.2d 925, 927.) In the present case, the jury was instructed to ignore defendant's race and religion in reaching its verdict and a reviewing court is reluctant to disturb the trial court's finding where such an instruction has been given. *Hernandez*, 865 F.2d at 928 n. 2.

While we readily denounce any attempt to infuse religious or racial prejudice into a defendant's case, we find that in this instance, defendant was not denied due process, he received a fair trial and the jury reached a reasonable verdict, given the evidence.[1]

---

[1]Other cases that have found racial comments not grounds for reversal: *People v. Hayes* (1990), 139 Ill. 2d 89, 144, 564 N.E.2d 803 (defendant's unobjected-to statement to witnesses that "brothers you all be cool" because the victims were "honkies" not plain error); *People v. Sanchez* (1990), 206 Ill. App. 3d 90, 105-06, 563 N.E.2d 1127 (defendant's statement made weeks before the victim's death, that he would get rid of a group of Mexican immigrants that included the victim, was admissible since it was not so general or impersonal and its probative value outweighed it prejudicial effect); *People v. McKay* (1985), 138 Ill. App. 3d 446, 452-53, 485 N.E.2d 1257 (prosecutor's closing argument comment that accused did not belong in the area of the charged burglary because he lived elsewhere was proper comment on facts regarding absence of valid reason for accused's presence and did not raise improper inference that defendant committed burglary merely because he was black and present in the area).

While defendant cites several Federal cases, none found defendant was denied a fair trial: *United States v. Hernandez* (7th Cir. 1989), 865 F.2d 925 (prosecutor's reference in closing argument to defendant as a "Cuban drug dealer" was not an intentional attempt to prejudice the jury); *United States v. Krohn* (10th Cir. 1978), 573 F.2d 1382 (court found no error in admitting defendant's comment that a person was "a poor black bastard" where the comment was relevant evidence of defendant's acknowledgement that the person had been defrauded); *United States v. Goldman* (1st Cir. 1977), 563 F.2d 501, 504 (prosecutor's comment in closing argument that defendant "defamed, defiled and scandalized" the Jewish religion did not require automatic reversal and the trial judge gave curative instructions).

Defendant next argues that the State's exhibition of Officer Duffy's scars to the jury was irrelevant and inflammatory; that the scars were not probative of the injuries inflicted upon Duffy by defendant; that there were other scars from the surgery visible; and that the display was gruesome.

Defendant was charged with attempted first degree murder, and the nature and seriousness of the injury are essential elements of the charge. (*People v. Chatman* (1982), 110 Ill. App. 3d 19, 24, 441 N.E.2d 1292.) Intent may be inferred when the State shows defendant committed a substantial step toward the commission of murder: when he shoots and wounds his victim. *Chatman,* 110 Ill. App. 3d at 24; *People v. Pearson* (1972), 4 Ill. App. 3d 462, 281 N.E.2d 422; *People v. Rodgers* (1972), 3 Ill. App. 3d 85, 279 N.E.2d 72; *People v. Cunningham* (1966), 73 Ill. App. 2d 357, 218 N.E.2d 827.

While defendant argues that there was ample evidence to prove intent to kill and that the surgical scars altered the appearance of the original wounds, the State has a right to prove every element of the crime and defendant had an opportunity to cross-examine Duffy as to the nature and appearance of the original scars. *Chatman,* 110 Ill. App. 3d at 25.

■ The trial court's decision to allow evidence of Duffy's scars was not an abuse of discretion since evidence of the wounds was relevant to establish defendant's intent to kill him. *Chatman,* 110 Ill. App. 3d at 24; *Pearson,* 4 Ill. App. 3d at 465; *Rodgers,* 3 Ill. App. 3d at 98; *Cunningham,* 73 Ill. App. 2d at 364-65.

Defendant also argues that the prosecution wrongfully used defendant's understanding and waiver of his *Miranda* rights to prove defendant sane, thus violating his constitutional right to remain silent.

While we are aware of cases which hold that the State may not constitutionally use as evidence of defendant's sanity: (1) his post-*Miranda* silence (*People v. Ahmad* (1990), 206 Ill. App. 3d 927, 565 N.E.2d 137; *Wainwright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634), (2) his post-*Miranda* statements of intent to remain silent (*People v. Stack* (1986), 112 Ill. 2d 301, 493 N.E.2d 339), and (3) his post-*Miranda* request for counsel (*People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609), we find no support for defendant's proposition.

A closer case is *People v. McCleary* (1990), 208 Ill. App. 3d 466, 480, 567 N.E.2d 434, in which the court found no violation of defendant's rights where officers testified that defendant stated immediately after his arrest that he wanted his rights read to him and

where the State did not argue to the jury that such a request evidenced his sanity.

■ In the present case, defendant stated that he understood his rights but chose to waive them, including his right to remain silent. Thereafter, he gave a statement to the officer who secured the waiver. Unlike *Ahmad* and *Vanda*, no reference was made to this waiver or to his *Miranda* rights during closing argument and the State did not attempt to employ the circumstances surrounding that waiver to evidence defendant's sanity.

The officer was questioned about his conversation with the defendant after waiver of defendant's *Miranda* rights and was asked his opinion as to defendant's sanity. While such a question might be subject to objection without a proper foundation, no such objection was interposed by the defense and no subsequent reference was made to the conversation which resulted from the *Miranda* waiver.

Defendant also charges that the State improperly used the psychiatrists' findings of defendant's fitness to stand trial to establish sanity at the time of the offense. However, defendant failed to object to such questioning at trial or raise the issue in his post-trial motion, and we decline to review it on appeal. *Reid*, 136 Ill. 2d at 38; *Enoch*, 122 Ill. 2d at 186.

We believe that a finding of fitness to stand trial is not competent as evidence at trial (*People v. McCullum* (1977), 66 Ill. 2d 306, 362 N.E.2d 307; *People v. Bechtel* (1921), 297 Ill. 312, 130 N.E. 728), and cross-examination regarding defendant's fitness to stand trial is irrelevant and should not have been permitted. *People v. Littlejohn* (1986), 144 Ill. App. 3d 813, 494 N.E.2d 677.

■ However, in closely examining *Littlejohn*, we find the court there was concerned that confusion might be wrought upon the jury since the experts did not agree that defendant was fit to stand trial and there was substantial confusion as to the definition of insanity. Needless to say, the instruction defining insanity and mental illness refers to the time of the conduct or commission of the crime. Even if we did not believe the issue waived, we would consider it harmless error.

■ We also reject defendant's contention that he was denied a fair trial by the cumulative impact of the prosecution's misconduct, since we find there was no prejudicial misconduct in any instance.

In addition to the errors during testimony, defendant argues that it was error for the trial court to reject his tendered instructions which (1) stated the consequences of a not guilty by reason of

insanity verdict and (2) which included the offense of attempted second degree murder.

Generally, a trial court is not required to give a jury an instruction which relates the consequences of a not guilty by reason of insanity verdict. *People v. Glenn* (1992), 233 Ill. App. 3d 666; *People v. Liberg* (1985), 138 Ill. App. 3d 986, 990, 486 N.E.2d 973; *People v. Alerte* (1983), 120 Ill. App. 3d 962, 458 N.E.2d 1106, *habeas corpus granted United States ex rel. Alerte v. Lane* (N.D. Ill. 1989), 725 F. Supp. 936; *People v. Ford* (1983), 118 Ill. App. 3d 59, 62, 454 N.E.2d 1095; *People v. Parker* (1983), 113 Ill. App. 3d 321, 329, 447 N.E.2d 457; *People v. Hebein* (1982), 111 Ill. App. 3d 830, 837-40, 444 N.E.2d 782; *People v. Pitts* (1982), 104 Ill. App. 3d 451, 456, 432 N.E.2d 1062; *People v. Upshaw* (1981), 103 Ill. App. 3d 690, 698, 431 N.E.2d 1138; *People v. La Fiura* (1981), 92 Ill. App. 3d 714, 719, 415 N.E.2d 1365; *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058.[2]

*Glenn*, very recently decided by this appellate district, correctly observes that no Illinois case has reversed a conviction for failure to instruct as to consequences.

However, at least two of the cited cases considered the applicability of a "special circumstances exception" requiring an instruction regarding the consequences of a verdict of not guilty by reason of insanity. In both *Hebein* and *Alerte*, the defendants argued that special circumstances exist where the prosecutor's remarks imply that the defendant will be set free if he is found insane. *Alerte*, 120 Ill. App. 3d at 972-73; *Hebein*, 111 Ill. App. 3d at 838-39.

---

[2]At least 24 jurisdictions have required such an instruction: See *Schade v. State* (Alaska 1973), 512 P.2d 907; *People v. Moore* (1985), 166 Cal. App. 3d 540, 211 Cal. Rptr. 856; *People v. Thomson* (1979), 197 Colo. 232, 591 P.2d 1031; *State v. Wood* (1988), 208 Conn. 125, 545 A.2d 1026; *Taylor v. United States* (D.C. Cir. 1955), 222 F.2d 398; *Roberts v. State* (Fla. 1976), 335 So. 2d 285; *Spraggins v. State* (1988), 258 Ga. 32, 364 S.E.2d 861; *State v. Amorin* (1978), 58 Haw. 623, 574 P.2d 895; *State v. Hamilton* (1975), 216 Kan. 559, 534 P.2d 226; *State v. Babin* (La. 1975), 319 So. 2d 367; *Erdman v. State* (1989), 315 Md. 46, 553 A.2d 244; *Commonwealth v. Mutina* (1975), 366 Mass. 810, 323 N.E.2d 294; *People v. Cole* (1969), 382 Mich. 695, 172 N.W.2d 354; *Hill v. State* (Miss. 1976), 339 So. 2d 1382; *State v. Pike* (Mo. App. 1974), 516 N.W.2d 505; *Novosel v. Helgemoe* (1978), 118 N.H. 115, 384 A.2d 124; *State v. Krol* (1975), 68 N.J. 236, 344 A.2d 289; *People v. Bassik* (1981), 53 N.Y.2d, 425 N.E.2d 873; *Kuk v. State* (1964), 80 Nev. 291, 392 P.2d 630; *State v. Hammonds* (1976), 290 N.C. 1, 224 S.E.2d 595; *Commonwealth v. Mulgrew* (1977), 475 Pa. 271, 380 A.2d 349; *Matlock v. State* (Tenn. Crim. 1978), 566 S.W.2d 892; *State v. Shickles* (Utah 1988), 760 P.2d 291; *State v. Nuckolls* (1980), 166 W. Va. 259, 273 S.E.2d 87.

The *Hebein* court, acknowledging such a narrow exception might exist, determined that it was not applicable in that case since there was no direct comment on the consequences of a verdict of not guilty by reason of insanity. The court also noted that the failure to give the instruction even where special circumstances exist would be harmless error absent a showing that there is a reasonable possibility that the error might have contributed to the jury's finding. *Hebein*, 111 Ill. App. 3d at 839-40.

In *Alerte*, the defendant contended that the prosecutor's remarks warranted special circumstances:

> "[Assistant State's Attorney]: You decide. Are we going to let Frank Alerte skate? Are we going to let him get a slap on the wrist again and walk out of this courtroom and—
>
> [Defense Counsel]: Objection.
>
> [Assistant State's Attorney]: —and scoff at all of us?
>
> [THE COURT]: Punishment is left up to me.
>
> [Assistant State's Attorney]: We are going to slap him on the wrist and let him walk out because of somebody like [defendant's psychiatrist expert]?"

■ These remarks closely mirror those of the prosecutor in the case at bar. Both refer to "walking out" and both disparage the testimony of the psychiatric experts. If anything, the remarks which we must consider here are more tempered than those of *Alerte*. Moreover, defense counsel's clear statement to the jury, "Don't be misled by anyone telling you he will walk out that door if you find him not guilty[,] [i]t's not true" provided a level of fairness similar to the court's observation in *Alerte* that "punishment is left up to me."

We find no special circumstances to warrant defendant's consequences instruction.

We also find no error in the trial court's denial of defendant's instruction on attempted second degree murder. In 1987 the Illinois General Assembly replaced the statutory offense of voluntary manslaughter with the offense of second degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—2). The new statute requires the State to prove the elements of first degree murder beyond a reasonable doubt (that defendant knowingly or intentionally killed without legal justification) and thereafter the defendant has the burden to prove by a preponderance of evidence a mitigating factor, either (1) a sudden and intense passion resulting from serious provocation, or (2) at the time of the killing, the accused believes the circumstances to be such that, if they existed, would justify the kill-

ing, but his belief is unreasonable. Ill. Rev. Stat. 1987, ch. 38, pars. 9—2(a)(1), (a)(2). See *People v. Drakeford* (1990), 139 Ill. 2d 206, 211, 564 N.E.2d 792.

■ We believe there is no evidence of mitigation in the case at bar that justifies the giving of the instruction even if the crime of attempted second degree murder existed in Illinois. Defendant failed to validly prove a sudden and intense passion or that he was seriously provoked by the officers' routine stop for passing a school bus.[3] The evidence adduced at trial was that defendant was either insane or that he had a longstanding mental illness, neither of which is a mitigating factor under the statute. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—2(a)(1), (a)(2).) An unproved insanity defense was not intended to be a mitigating factor in the crime of second degree murder. (See *People v. Pecina* (1985), 132 Ill. App. 3d 948, 954, 477 N.E.2d 811 (where the court rejected defendant's in-

---

[3]Other Illinois cases which have found a voluntary manslaughter or second degree murder instruction was not warranted by the evidence include: *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131 (beating death of victim over period of time by a number of assailants did not involve sudden and intense passion resulting from serious provocation; *People v. Lewis* (1992), 229 Ill. App. 3d 874, 594 N.E.2d 414 (no evidence that defendant was a willing participant in mutual combat in which defendant stabbed the victim in self-defense); *People v. Brown* (1991), 222 Ill. App. 3d 703, 584 N.E.2d 355 (defendant's testimony that he had a verbal disagreement with the victim, coupled with witness testimony that he threatened to kill the victim, showed insufficient provocation, and the wounds to the back of the victim's head contradicted defendant's self-defense theory); *People v. Villegas* (1991), 222 Ill. App. 3d 546, 584 N.E.2d 248 (second degree murder instruction properly refused where defense theory was based upon misidentification rather than sudden and intense passion, and defendant's deadly response was not an appropriate amount of retaliation given the evidence); *People v. Newbern* (1991), 219 Ill. App. 3d 333, 579 N.E.2d 583 (no evidence of serious provocation was established where an eyewitness testified to friendly behavior between defendant and victim immediately prior to the attack and only the victim sustained bruises and stab wounds); *People v. Dower* (1991), 218 Ill. App. 3d 844, 578 N.E.2d 1153 (improper instructions were harmless where there was no evidence of self-defense against a victim who allegedly threatened defendant with a knife); *People v. Harris* (1984), 123 Ill. App. 3d 899, 463 N.E.2d 1030 (defendant who shot estranged wife not entitled to voluntary manslaughter instruction since he knew of her boyfriend for approximately one month prior to the shooting and the couple were merely together in the same house when defendant shot them); *People v. Barnes* (1982), 107 Ill. App. 3d 262, 437 N.E.2d 848 (no evidence that defendant acted in the heat of sudden and intense passion when he threw an iron at the victim and its cord allegedly wrapped around the victim's throat); *People v. Toth* (1982), 106 Ill. App. 3d 27, 435 N.E.2d 748 (victim who hit defendant with paintbrush and brandished a steak knife did not pose sufficient self-defense threat or provide sufficient provocation inciting sudden and intense passion).

struction on voluntary manslaughter even though there was evidence that tended to support the defenses of insanity and voluntary intoxication).) The predatory conduct of the defendant in searching out his victims would negate the notion of self-defense. We find no abuse of discretion by the trial court rejecting the tendered instruction because of a lack of evidence to support such an instruction if such a crime exists.

■■■ Further, we determine that the legislative history of the second degree murder statute demonstrates that attempted second degree murder does not exist.

The second degree murder statute was fashioned to replace voluntary manslaughter, and before the 1987 enactment, the crime of attempted voluntary manslaughter did not exist. (*People v. Reagan* (1983), 99 Ill. 2d 238, 457 N.E.2d 1260.) Voluntary manslaughter required the State to prove the mitigating circumstances. The court in *Reagan* rejected the curious dichotomy that attempted voluntary manslaughter would require the defendant to specifically intend to kill with unreasonable belief, and found that a defendant could not intend an unreasonable belief and that the crime of attempted voluntary manslaughter did not exist.

In examining the legislative history of section 9—2, we find that in debates and analysis, members of the General Assembly indicated their belief that the only change from voluntary manslaughter to second degree murder was a shift in the burden of proving the mitigating factors from the State to the defendant.[4]

We considered the existence of the crime of attempted second degree murder in *People v. Williams* (1991), 220 Ill. App. 3d 460, 581 N.E.2d 113, and determined that this crime predicated on an

---

[4]"We're going to be eliminating the term 'voluntary manslaughter.' We're going to have murder 1 and murder 2. And what we're doing, however, is not to change the elements of the offense of voluntary manslaughter, but we're basically changing the burden of proof to the defendant." 84th Ill. Gen. Assem., House Proceedings, June 23, 1986, at 72 (statements of Representative Cullerton).

"[I]n those cases where there are mitigating circumstances, such as serious provocation, that would serve as a justification for reducing a murder charge to a voluntary manslaughter, and now a first degree murder charge to a second degree murder charge that the defendant, and not the state, would bear the burden of proving the mitigating circumstances." 84th Ill. Gen. Assem., House Proceedings, June 23, 1986, at 71 (statements of Representative Homer).

"What we are attempting to do here is just divide it into first and second degree murder, and therefore, we think that prosecutors will charge when it is a manslaughter case the way they properly should." 84th Ill. Gen. Assem., Senate Proceedings, May 23, 1985, at 38 (statements of Senator Sangmeister).

imperfect self-defense theory was not created by the legislature. *Williams* acknowledged that the Third District of the Illinois Appellate Court recognized attempted second degree murder based on sudden and intense passion. (*People v. Moore* (1990), 204 Ill. App. 3d 694, 562 N.E.2d 215.) *Moore* is thoughtfully reasoned and based upon the conclusion that the statute requires that the jury first find all of the elements of first degree murder and then consider whether defendant acted under a separate and intense passion resulting from serious provocation.

The intent element is, therefore, unrelated to the mitigating factor of provocation and the *Moore* court reasons that the crime of attempted second degree murder exists.

In a split opinion, the second district followed *Moore* in *People v. Austin* (1991), 215 Ill. App. 3d 323, 574 N.E.2d 1297, which agreed that the separation of intent from mitigating factors or provocation was sufficient to allow a defendant to be convicted of attempted second degree murder. *Austin*, 215 Ill. App. 3d at 332.

However, the concurring opinion in *Austin* argued, we think persuasively, that *Reagan* continued to apply and control these issues and rejected the notion that the legislature had created the offense of attempted second degree murder. We agree with Justice Nickels' observation in the concurring opinion that

> "[t]he legislature in enacting the 1987 second degree murder statute renamed voluntary manslaughter and, more importantly, substantively realigned the burden of proof so that a defendant must now prove either provocation or unreasonable belief by a preponderance of the evidence, rather than the State disprove either beyond a reasonable doubt." *Austin*, 215 Ill. App. 3d at 336 (Nickels, J., specially concurring).

Justice Nickels stated that, based solely on that change, *Moore* found that the second degree murder statute transformed voluntary manslaughter into a specific intent crime because the State must first prove a defendant guilty of a specific intent crime of first degree murder and that voluntary manslaughter also required the State to first prove each of the elements of murder; thus, the legislature neither changed the essential, nonspecific nature of the offense of second degree murder nor diminished the applicability of *Reagan. Austin*, 215 Ill. App. 3d at 336 (Nickels, J., specially concurring).

The authorities in Illinois are of a different mind and this case is the fourth to address the existence of the crime of attempted sec-

ond degree murder. Commentators are similarly at odds.[5] However, we follow *Williams* (220 Ill. App. 3d 460, 581 N.E.2d 113) and find that the crime of attempted second degree murder is not a crime in Illinois.

Defendant next claims it was error for the trial court to allow the jury to hear the "911" tape because no proper foundation was laid, the tape was partially unintelligible and the contents were irrelevant and inflammatory.

Sound recordings that are otherwise competent, material and relevant are admissible into evidence if a proper foundation has been laid to assure the authenticity and reliability of the recording. *People v. Gaurige* (1988), 168 Ill. App. 3d 855, 863, 522 N.E.2d 1306.

Adequate foundation for the admission of a tape recording is established when a witness to the material recorded testifies that the tape, as it exists in court, accurately portrays the conversation in question. *People v. Rogers* (1989), 187 Ill. App. 3d 126, 132, 543 N.E.2d 300; *People v. Cochran* (1988), 174 Ill. App. 3d 208, 212, 528 N.E.2d 253; *People v. Williams* (1985), 109 Ill. 2d 327, 338, 487 N.E.2d 613.

A partially inaudible tape recording is admissible unless the inaudible portions are so substantial as to render the recording untrustworthy as a whole, and the admission of a partially inaudible recording is a matter within the trial court's discretion. *Rogers*, 187

---

[5]Several writers claim parentage of the 1987 legislative enactment. James B. Haddad, a professor of law at Northwestern University, initially considered the statutory change in Haddad, *Allocation of Burdens in Murder-Voluntary Manslaughter Cases: An Affirmative Defense Approach*, 59 Chi.-Kent L. Rev. 23 (1982).

Professor Haddad's concepts were embodied in legislation considered but not enacted in 1983. Additionally, he has written a critical analysis of the impact of the new statute and has clearly stated that the mere change in name from voluntary manslaughter to second degree murder does not resolve the question of whether attempted second degree murder should be recognized. Professor Haddad believes that the same reasons applied to deny recognition of a crime called attempted second degree murder were applicable when the Illinois Supreme Court considered *Reagan.* Haddad, *Second Degree Murder Replaces Voluntary Manslaughter in Illinois: Problems Solved, Problems Created*, 19 Loy. U. Chi. L.J. 995, 1023 (1988).

A contrary conclusion is drawn by professor Timothy P. O'Neill in *An Analysis of Illinois' New Offense of Second Degree Murder*, 20 J. Marshall L. Rev. 209 (1986). Professor O'Neill fashions himself as the real father of section 9—2. On the other hand, the Honorable Robert J. Steigmann holds himself out to be, if not the father of the legislation, then at least its midwife.

Ill. App. 3d at 132; *People v. Dougherty* (1987), 160 Ill. App. 3d 870, 876, 513 N.E.2d 946.

 The trial court in the present case stated that the tape was relevant as evidence to rebut defendant's self-defense theory and that it was excited utterance evidence.

The tape demonstrates that when defendant was in no immediate danger of serious bodily harm, he shot at police officers from his car after he had left the area of the original altercation, wounding a third officer.

Further, a proper foundation was laid when Officer Mertz, a party to the conversation, testified that he had listened to the tape and that it was an accurate recording of the police radio transmissions that day. Defendant also stipulated that it was an accurate reproduction. We reject defendant's offhand claim that it was ineffective assistance of counsel for his attorney to stipulate to the accuracy of the recording.

Defendant finally argues that the trial court abused its discretion in sentencing defendant to an extended term of 60 years for the shooting of Officer Duffy and 30 years each for the shootings of Officers Matura and Mertz, sentences to run consecutively.

A trial court's decision with respect to sentencing is entitled to great deference and weight (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344), and will not be altered upon review absent an abuse of discretion (*People v. Andrews* (1989), 132 Ill. 2d 451, 464, 548 N.E.2d 1025), since it is the trial court that is in a supe-

---

In an article entitled *First and Second Degree Murder in Illinois*, 75 Ill. B.J. 494 (1987), Judge Steigmann, in detailing his own lobbying efforts on behalf of the legislation, states "As this author explained in testimony before the House and Senate Judiciary Committees, the statute defining second degree murder was written with the specific intention of retaining all of the substantive law, both statutory and case law, previously applicable to the statute defining the offense of voluntary manslaughter." (Steigmann, 75 Ill. B.J. at 495.) A page or two later in the article, Judge Steigmann advises us that *Reagan* is no longer applicable and that the offense of attempted second degree murder "does now exist in Illinois law." Steigmann, 75 Ill. B.J. at 498, 511.

In addition, Judge Steigmann testified before the Illinois House of Representatives, Judiciary II Committee, on April 2, 1986, and in support of HB 522 stated:

"I would like to emphasize that I have in no way changed the substance or definition of this at all. I have not changed a syllable of what we have previously defined 25 years ago and have come to understand the offenses of murder and voluntary manslaughter to be[.] *** What we have done is to change the burden of proof to make the law more consistent and understandable and to put the burden where it should be." 84th Ill. Gen. Assem., House Judiciary II Committee Proceeding, April 2, 1986, tape recording.

rior position to determine the appropriate sentence based on such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *People v. Streit* (1991), 142 Ill. 2d 13, 19, 566 N.E.2d 1351; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.

▆▆ Attempted first degree murder is a Class X felony with a sentence of not less than six years but not more than 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(3).) We find that given the unique circumstances in this case, the trial court did not abuse its discretion in sentencing defendant to 30 years each for the shootings of Officers Matura and Mertz. The trial court rightfully concluded that public safety was an issue, since defendant was now guilty of three incidents of violence directed against law enforcement officers.

We further find that it was not error for the trial court to sentence defendant to an extended term of 60 years for the shooting of Officer Duffy.

An extended term of between 30 and 60 years may be applied if the trial judge determines that even one aggravating factor is present, as set out in section 5—8—2(a)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(2)). (*People v. Woods* (1984), 122 Ill. App. 3d 176, 182, 460 N.E.2d 880.) Defendant claims that the State has not proved that the offense was accompanied by brutal and heinous behavior. Heinous has been described as "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal," while brutal conduct has been described as "grossly ruthless," "devoid of mercy or compassion: cruel and cold-blooded." *Andrews*, 132 Ill. 2d at 465.

While defendant contends that his conduct was not as brutal or heinous as in other cases, we point out that each sentence is determined by the circumstances of the individual case (*People v. Bishop* (1989), 179 Ill. App. 3d 99, 103, 534 N.E.2d 401) and that even a single stab wound has been determined to be brutal. *People v. Diamond* (1992), 229 Ill. App. 3d 48, 54, 593 N.E.2d 753; see also *People v. Barfield* (1989), 187 Ill. App. 3d 190, 202, 543 N.E.2d 812.

We find that defendant's actions in his repeated shooting of Officer Duffy and in returning to search for Duffy after he had shot him indicated a cold-blooded and ruthless desire to kill Duffy. Ann Claxton testified that defendant roamed from one side of the street to the other with his gun drawn, searching for Officer Duffy. Defendant appeared to be so mercilessly focused on pursuing Duffy that he followed Ms. Claxton's false information as to which direction Duffy had

taken when he left the scene in his taxicab. The trial court did not abuse its discretion in sentencing.

For all of the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

RIZZI and CERDA, JJ., concur.